928 P.2d 678

**STATE of Arizona, Appellee,**

v.

**William Earl MILLER, Appellant.**

**No. 1 CA–CR 95–0033.**

Court of Appeals of Arizona,
Division 1, Department E.

May 28, 1996.

Review Denied Nov. 19, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Crane McClennen, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Lawrence S. Matthew, Deputy Public Defender, Phoenix, for Appellant.

OPINION

THOMPSON, Judge.

William Earl Miller (defendant) was found guilty of one count of attempted murder, a class two felony. He appeals his conviction and sentence imposed, arguing that statements made by witnesses to the police which were inconsistent with those witnesses' trial testimony should not have been admitted into evidence. For the following reasons, we affirm.

## FACTS [1] AND PROCEDURAL HISTORY

On July 23, 1993, the state indicted defendant and Soccretes Holmes (Holmes) for attempted murder, a class two dangerous felony, and attempted armed robbery, a class three dangerous felony. Following a jury trial, defendant and Holmes were both found guilty of attempted murder. The jury also found Holmes guilty of attempted armed robbery, but acquitted defendant of this charge.

The facts presented at trial established that in the pre-dawn hours of October 29, 1992, defendant, Holmes, and three other black males drove to an area known as the Osborn Projects at 17th Street and Monroe in the City of Phoenix. While walking through the Osborn Projects, they observed two women fighting in a parking lot. One of the women, Lori Jones (victim), had driven with a friend to the Projects. While the victim waited for her friend to pick up some money and clothes from inside an apartment, a woman forcibly pulled the victim from the car, repeatedly struck her, and then took the victim's purse from the car.

The victim testified at trial that a group of black men approached her while she was being beaten, and that one of the men demanded her money or else "[they] were going to kill [her]." She replied that she did not have any money. She was then shot five times: twice in the head, twice in the back, and once in the wrist. After struggling to her friend's apartment, the victim passed out and was subsequently taken to the county hospital.

While patrolling the Osborn Projects that morning, Officer Norman Smith heard five gunshots fired from the area where the victim had been shot. When he walked towards the direction in which he had heard the shots, Officer Smith saw a red and black Nissan pulling out of an alley. He attempted to stop the vehicle by stepping into the road in full uniform, signaling with his hands, and shining his flashlight at the driver. The car continued toward him without stopping. Officer Smith moved out of the street to avoid being struck by the car and, as the car sped by, he wrote down its license plate number. He then proceeded to broadcast the license plate number over the radio. He testified that the driver of the car was black, although he could not determine how many passengers were in the car.

On the morning of October 30, Detective Rebecca Todd (Todd) of the Phoenix Police Department interviewed Charles Harris (Harris) regarding the shooting. Detective Todd testified at trial that in a police report Harris's name had been "brought up as possibly being the driver of the car." Harris was already in police custody following his arrest the previous evening for carrying a concealed nine millimeter handgun at a shopping mall. Todd testified that Harris said during the interview that he, defendant, Holmes, Johnny Cornelius (Cornelius), and Antron Lewis (Lewis) witnessed a fight between two women in the parking lot of the Osborn Projects on October 29, 1992. He said they stopped to watch the fight, laughing at the two women. He stated that Holmes then demanded money from the victim. Harris walked away from the fight along with Cornelius and Lewis because they did not want to get involved. Harris told Detective Todd that while walking away he heard gunshots from two different caliber weapons, and looked back to see the victim with blood on her head and face. Defendant and Holmes then ran toward them. Harris told Todd that, as he drove out of the lot, he saw a police officer step in front of his car with a flashlight, but that he did not stop. Harris stated that both defendant and Holmes shot the victim. At a subsequent interview with Todd, Harris gave the same account of the incident, including his statement that defendant and Holmes did the shooting.

Detective Allen Reed (Reed) of the Tempe Police Department interviewed Harris in April and May of 1993. Detective Reed testified at trial that during those interviews Harris had said that he and defendant and three other men observed a fight between the victim and another woman. Harris said

---

1. We view the facts in the light most favorable to sustaining the verdict, resolving all reasonable inferences therefrom against the defendant.

*State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

that the woman striking the victim demanded money from the victim. Reed testified that Harris said that defendant held a nine millimeter handgun to the victim's head, said "something to the effect of 'F this white woman,'" and shot her once in the head. Harris told Detective Reed that Holmes shot the victim four times. Reed also testified that Harris asked him whether the victim had survived the shooting. At trial, a tape containing Harris's statements to Detective Reed was admitted into evidence and played for the jury over defense objections.

At defendant's trial, Harris testified that he and four friends, including defendant and Holmes, drove to the Osborn Projects in his mother's red and black car on October 29, 1992. While walking through the parking lot at the Projects, he and his friends saw two women fighting. Harris said that as he walked past the fight, he heard numerous gunshots. Harris testified that he ran to his car with his friends without ever turning around. When they pulled out of the lot, Harris saw someone shine a flashlight at him, but he did not stop the car. Harris stated that he did not see who had fired the shots. He initially denied ever having spoken to Detectives Todd or Reed about the incident, but later testified that, if he had spoken to Reed, he had probably lied to him. When asked during redirect examination how he could have lied during a conversation he alleged never took place, Harris responded that he did not remember being interviewed by Detective Reed.

At trial, Sergeant Jesse James, Jr. testified about an interview he and Detective Todd had conducted with Cornelius. Cornelius told the detectives that he, defendant, Holmes, Harris, and Lewis observed the fight between the two women in the Osborn Projects. He said that he did not see the subsequent shooting, but that neither he, Harris, nor Lewis had been involved. When asked by the detectives whether either defendant or Holmes shot the victim, Cornelius replied that "[he] ain't no snitch." Cornelius told the detectives that he saw defendant putting a gun in his coat pocket as he ran to the car following the gunshots. He also stated that prior to arriving at the Osborn Pro-

jects defendant and Holmes talked about wanting to find someone to shoot. After the shooting, Cornelius said that, either Holmes or defendant bragged about shooting the victim.

Cornelius testified at trial that he had been with defendant, Holmes, Harris, and Lewis at the Osborn Projects, and had seen the fight between the two women. He stated that he heard gunshots and then ran back to the car with Harris and Lewis. Defendant and Holmes also ran to the car, arriving "seconds" after Cornelius, Harris, and Lewis. Cornelius further testified that he saw a nine millimeter handgun in Harris's car that evening. Cornelius recalled being interviewed by Detective Todd, but denied telling her that either defendant or Holmes bragged about being involved in the shooting. He also denied telling police that defendant and Holmes planned a shooting that night. He denied telling police that he saw defendant with a gun that night. He testified that he had not told police that anyone with him that night shot the victim.

Detective Todd testified at trial concerning an interview she conducted with Holmes about a month after the shooting. She stated that Holmes initially implicated Harris in the shooting. However, after Holmes's mother voluntarily left the interrogation room, Holmes told Todd that "he wanted to tell [Todd] what had happened but he was frightened." Thereafter, he told Detective Todd that he had shot the victim once, but that he would not "tell on" defendant. Detective Todd further testified that Holmes told her that he had demanded the victim's money prior to shooting her with a .22 caliber handgun. After shooting her once, he turned around, and then heard more gunshots.

At trial, Holmes testified that he was with defendant, Lewis, Cornelius, and Harris on October 29, 1992. Holmes said that he saw the women fighting and heard the gunshots, but did not see who shot the victim. He stated that he saw Harris holding a gun just after he heard the gunshots. Holmes added that he remembered being interviewed by Detective Todd. However, he denied telling her that he had shot the victim.

Defendant also took the stand at his trial. He testified that he went to the Osborn Projects with Holmes, Lewis, Harris, and Cornelius. He said that when they saw the two women fighting, he and Holmes were walking together and the other three men were in a separate group. Defendant stated that as he and Holmes were walking to the car, he heard a single gunshot followed shortly by more gunshots, but did not see who fired them.

Defendant raises one issue on appeal. He argues that the trial court erred in admitting the prior inconsistent statements of Holmes, Cornelius, and Harris for substantive purposes where those statements provided the only evidence linking defendant to the offense.

## DISCUSSION

Defendant objected prior to trial to the state's intended use of out-of-court statements of three witnesses, Harris, Holmes, and Cornelius, to impeach anticipated inconsistencies in their trial testimony. He asserted that these statements were highly prejudicial and should not have been admitted based on the limitations established by *State v. Allred,* 134 Ariz. 274, 655 P.2d 1326 (1982). After oral argument, the trial judge ruled that the prior statements of Harris, Cornelius, and Holmes to the detectives would be admissible if they testified differently at trial. The judge based his decision on Arizona Rules of Evidence (Rule) 801 and 403 and *State v. Allred.*[2]

■ Decisions regarding the relevance and admissibility of evidence lie within the sound discretion of the trial court. *State v. Bible,* 175 Ariz. 549, 576, 858 P.2d 1152, 1179 (1993). Rule 801(d)(1)(A) creates a broad exception to the hearsay rule for prior inconsistent statements.[3] The rationale underlying this rule is that the jury should be allowed to hear the conflicting statements and

decide "which story represents the truth in the light of all the facts, such as the demeanor of the witness, the matter brought out on his direct and cross-examination, and the testimony of others." *State v. Moran,* 151 Ariz. 373, 375, 728 P.2d 243, 245 (App.1985) (citing Edmund M. Morgan, *Hearsay Dangers and the Application of the Hearsay Concept,* 62 Harv. L.Rev. 177, 196 (1948)). The trier of fact's role is to impartially consider the prior statement and evaluate its truth. When the witnesses are present and subject to cross-examination, admission of the statement as substantive evidence does not generally pose the risks often presented by hearsay evidence. *Id.*

■ Pursuant to Rule 403, however, prior inconsistent statements may be excluded if overly prejudicial. Rule 403 allows for the exclusion of relevant evidence where its probative value is substantially outweighed by the danger of prejudice, confusion, or misleading the jury. Recognizing the danger of unfair prejudice that could result from the admission of impeaching testimony that provides substantive evidence of guilt, our supreme court in *Allred* set forth a non-exhaustive list of five factors to consider in determining the prejudicial effect of the statements. The following circumstances are among the factors to be considered:

1) the witness being impeached denies making the impeaching statement, and

2) the witness presenting the impeaching statement has an interest in the proceeding and there is no other corroboration that the statement was made, or

3) there are other factors affecting the reliability of the impeaching witness, such as age or mental capacity, . . .

4) the true purpose of the offer is substantive use of the statement rather than impeachment of the witness,

> (1) *Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony . . .

2. The trial court also cited Rule 404 as support for its ruling. Rule 404 addresses the admissibility of character evidence.

3. Rule 801 provides:
   (d) Statements which are not hearsay. A statement is not hearsay if—

5) the impeachment testimony is the only evidence of guilt.

134 Ariz. at 277, 655 P.2d at 1329.

■ At the trial in this case, all three of the witnesses being impeached denied making the impeaching statements that implicated defendant. Holmes and Cornelius recalled being interviewed by Detective Todd, but denied saying that defendant had been involved in the shooting. Harris also denied making any inculpatory statements regarding defendant, although he vacillated in his testimony between denying that he ever spoke to Detective Reed and asserting that he lied to the detective during the interview.

Second, the witnesses providing the impeaching statements, Detectives Todd and Reed and Sergeant James, were not interested witnesses. A police officer is not per se "interested" merely by virtue of his or her involvement in a criminal investigation, absent evidence of some personal connection with the participants or personal stake in the case's outcome. *State v. Nevarez*, 178 Ariz. 525, 527, 875 P.2d 184, 186 (App.1993). Defendant offers no showing that any of the police officers involved in this case knew either defendant or had any personal interest in the outcome of the case. Without such evidence, the court properly concluded that these witnesses should not be excluded on the basis of an alleged interest in the case.

Third, the impeaching witnesses were not unreliable in terms of age or mental capacity. Nor did any of the police officers provide only sketchy or vague details regarding their interviews with Harris, Holmes, and Cornelius. All of the officers took contemporaneous notes during the interviews and, in Harris's case, tape-recorded the conversation. Thus, the doubts concerning the witnesses' reliability raised by incomplete, or possibly selective, memory are not presented here. *See, e.g., State v. Thomas*, 148 Ariz. 225, 229, 714 P.2d 395, 399 (1986).

Fourth, it is undisputed that the true purpose of the offer of impeachment in each instance was the substantive use of the statement rather than impeachment of the witness. The trial judge recognized this fact in his ruling, and the state itself admits that it sought to admit the statements more for substantive purposes than to attack the witnesses' credibility.

Finally, the impeachment testimony is the only evidence of guilt. The victim could not positively identify defendant as her assailant. She testified only that she saw a group of black males approach her, but that she did not see who actually shot her. Similarly, no physical evidence presented at trial directly linked defendant to the crime.

*Allred* does not state a per se rule of exclusion where inconsistent prior statements provide the sole basis of the state's case. *State v. Beck*, 151 Ariz. 130, 132, 726 P.2d 227, 229 (App.1986); *Moran*, 151 Ariz. at 376, 728 P.2d at 246. Although the testimony of the detectives at trial provided the only concrete link between defendant and the crime, we find that the statements of Harris, Holmes, and Cornelius to the detectives are mutually corroborative and cumulatively support defendant's conviction.

There is no evidence that any of the three witnesses were coerced into making statements to the detectives concerning the shooting. No promises or offers were made to Harris, Holmes, or Cornelius by the detectives in exchange for their statements. During their interviews and at trial, all three witnesses admitted that they were at the crime scene with the defendant, and that they observed the fight between the victim and another woman. Defendant himself corroborated this portion of the witnesses' statements in his testimony. Moreover, during their interviews, Harris, Holmes, and Cornelius all implicated defendant in the crime. Detective Reed testified that Harris said that defendant demanded money from the victim and shot her in the head. Cornelius told the police that defendant talked about wanting to shoot someone prior to arriving at the Osborn Projects. He stated that defendant put a gun in his coat pocket while running to the car immediately following the gunshots. When asked directly whether defendant shot the victim, Cornelius replied that he would not "snitch," although he did state that neither Harris nor Lewis were involved. Likewise, Detective Todd testified that Holmes

refused to "tell on" defendant when asked who had committed the offenses.

 Under these circumstances, we find that the court properly allowed the jury to hear the impeaching testimony. The probative value of the prior inconsistent statements was not substantially outweighed under Rule 403 by a risk of prejudice or of misleading the jury. Defendant claims that three of the five *Allred* factors were met because Harris, Holmes, and Cornelius denied making the impeaching statements, the true purpose of the state's offer was the substantive use of the statement, and the impeachment testimony was the only evidence of guilt. Since a majority of the five factors are present, defendant argues that the evidence should have been excluded. While these factors may militate in favor of exclusion, the considerations announced in *Allred* are not to be applied mechanistically. Rather, *Allred* requires that we analyze the factors on a case-by-case basis. *Beck,* 151 Ariz. at 132, 726 P.2d at 229. Further, the *Allred* factors are not exhaustive; the court may weigh other factors in reaching its decision. *Allred,* 134 Ariz. at 277, 655 P.2d at 1329. We therefore find that the court made the appropriate inquiry and did not abuse its discretion.

## CONCLUSION

Having considered the issues raised by defendant, and having further reviewed the record for fundamental error and found none, we affirm the conviction and sentence.

GERBER, P.J., and VOSS, J., concur.