**Karl A. SCHLEDWITZ, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

No. 97–6057.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 21, 1998.

Decided March 3, 1999.

Ann C. Short (argued and briefed), Herbert S. Moncier (briefed), Law Office of Herbert S. Moncier, Knoxville, Tennessee, Arthur J. Andrews (briefed), Andrews & Hudson, Knoxville, Tennessee, for Petitioner–Appellant.

Jimmie Baxter, Asst. U.S. Attorney (argued), Knoxville, Tennessee, Gary Humble, Asst. U.S. Attorney (briefed), Chattanooga, Tennessee, for Respondent–Appellee.

Before: MERRITT, JONES, and SILER, Circuit Judges.

NATHANIEL R. JONES, J., delivered the opinion of the court, in which MERRITT, J., joined. SILER, J. (pp. 1017–18), delivered a separate dissenting opinion.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

For the third time, Karl A. Schledwitz appeals to this court seeking relief from his 1992 conviction for mail fraud. In the instant appeal, Schledwitz contends that the district court erroneously denied his motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 based on the government's failure to disclose (1) material, exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and (2) the full extent of an apparently "neutral" governmental witness's involvement in the investigation against him. Although we have already rejected a similar challenge to Schledwitz's conviction, Schledwitz now submits that he has uncovered even more previously-undisclosed *Brady* evidence and discovered that the "neutral" witness was even more intimately involved in the investigation than as originally believed. Since we cannot reconcile the findings of the district court with the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), we will reverse the district court's denial of the § 2255 motion, and vacate Schledwitz's conviction.

## I. Background

Because this case has a lengthy procedural history, and because the underlying facts to

Schledwitz's conviction have already been recited in previous decisions rendered by this court, we will borrow from the background contained in those opinions, sometimes verbatim.

## A. The Alleged Fraudulent Scheme

Schledwitz was an attorney in Memphis, Tennessee. He was also a political activist, as well as an associate of Jacob F. ("Jake") Butcher and his brother, C.H. Butcher, Jr. Prior to the early 1980s, the Butcher brothers together effectively controlled as many as twenty-five financial institutions in Tennessee and Kentucky.

According to the government, Schledwitz was a "player" or a "nominee" for the Butcher brothers in a scheme based on numerous fraudulent bank loans. Schledwitz allegedly agreed to receive loans from the Butcher-controlled banks with no intention of ever repaying them. Instead, these loan proceeds were allegedly used for a variety of improper purposes to benefit the Butcher brothers personally, such as for manipulation of the Butchers' bank stock and satisfaction of the Butchers' personal debts. Additionally, the government contended that the loan proceeds were used to promote an alliance between the Butcher brothers and then-Congressman Harold E. Ford, who was Tennessee's most powerful African–American politician at the time. In return for Schledwitz's role in the scheme, the Butchers provided Schledwitz with business for his law practice and allowed him to keep some of the loan proceeds for his own use.

In total, the Butcher-controlled banks loaned more than $1.5 million in Schledwitz's name. Many of these loans were unsecured, and were made to Schledwitz at a time that he did not have the personal income to justify such loans. For example, in 1980, due to his loans from the Butcher banks, Schledwitz was billed $89,709.69 in interest, while he reported only $28,385 in total income. J.A. at 200. In 1981, the total interest due on his loans was $122,647.91, whereas his total income was only $31,994. *Id.* at 200. In 1982, his interest obligations were $172,957,57, but his total income was $52,163. *Id.* at 203. In

fact, the 1982 interest obligation alone exceeded Schledwitz's total income for the combined years of 1978 to 1982.

## B. The Investigation and the Ford Trials

In 1983, the Butchers' banking empire collapsed. Charges were brought against each of the Butcher brothers. For his part in the scheme, Jake Butcher pled guilty to bank fraud in 1984 and was sentenced to 20 years in prison. He served six years and eight months at a federal prison, and was paroled in 1992. After being acquitted of related charges, C.H. Butcher pled guilty to five counts of bankruptcy fraud in April 1987. He agreed to cooperate with federal authorities in their cases related to the collapse of the Butcher banking empire, and eventually served seven years in prison.

An investigation by federal regulators following the collapse of the Butcher banks revealed that Schledwitz owed $1.5 million to the Federal Deposit Insurance Corporation ("FDIC"); and $485,000 to the Southern Industrial Banking Corporation ("SBIC"), an uninsured state-regulated thrift. Schledwitz eventually settled those obligations for $90,-000 and $30,000, respectively. On April 24, 1987, Schledwitz, Congressman Ford, and two others were charged in the Eastern District of Tennessee in a nineteen count indictment with conspiracy, bank fraud and mail fraud.[1] The case was transferred to the Western District of Tennessee upon defendants' motion, and a jury trial, presided by the Honorable Odell Horton, was held in Memphis.

On April 27, 1990, the Memphis proceedings ended in a mistrial after the jury announced it was hopelessly deadlocked. A year later, Judge Horton ruled that a new trial for the defendants would be held in Memphis, but, over defendants' objections, the jury pool for the new trial would be selected from Western Tennessee communities outside of Memphis. We upheld Judge Horton's ruling on appeal. *See In re Ford,* 987 F.2d 334 (6th Cir.1992). Upon retrial presided by the Honorable Jerome Turner, a

---

1. We had occasion to consider an interlocutory appeal challenging the imposition of a "gag" order in the case as unconstitutionally broad. We reversed the order in a published opinion. *See United States v. Ford,* 830 F.2d 596 (6th Cir.1987).

federal jury found Schledwitz and his co-defendants not guilty on all charges on April 9, 1993.

## C. The Greeneville Trial and Direct Appeal

In the meantime, Schledwitz alone was indicted on additional, related charges in the Eastern District of Tennessee on January 21, 1992. Schledwitz was then charged with eight counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342, for bilking the Butcher banks and defrauding the FDIC and SBIC in their attempts to recoup the lost loans. The case was assigned to the Honorable Thomas Gray Hull, who subsequently dismissed five of the eight counts—all of which were based on defrauding the FDIC and SBIC. The remaining three counts were (1) that Schledwitz allegedly used the loans to assist Jake Butcher's manipulation of United American Bank ("UAB") stock in banks controlled by the Butchers; (2) that Schledwitz allegedly borrowed $40,000 from the City and County Bank of Roane County (which was controlled by the Butchers) to repay C.H. Butcher's Las Vegas gambling debts; and (3) that Schledwitz borrowed $115,000 from the City and County Bank of Anderson County (which was also controlled by the Butchers) to promote the Butchers' political interests in West Tennessee.

Prior to his trial, Schledwitz requested that the government provide him with exculpatory evidence as mandated by *Brady v. Maryland.*[2] Specifically, Schledwitz requested: "Any prior testimony, which tends to exculpate the defendant, made to the Department of Justice, the United States Attorney's Office, the FDIC, other federal agencies, and/or the Grand Jury by ... Jacob H. 'Jake' Butcher." J.A. at 785. In response, the government stated that it had complied with its *Brady* obligations, and had supplied Schledwitz with all exculpatory evidence.

At trial, the prosecution produced evidence of Jake Butcher's scheme to create a market for bank stock in his banks, and to make loans in furtherance of this scheme and in furtherance of the Butchers' personal and political interests. As an alleged "player" in

this scheme, the prosecution showed at trial how Schledwitz received numerous loans from the Butcher banks when his income did not justify those loans.

With regard to the Jake Butcher loans involved in count one, Schledwitz borrowed approximately $450,000 to buy UAB of Knoxville stock at a time when his total annual income was $34,313. An associate of Jake Butcher's, Jesse Barr, testified at trial that Jake asked Schledwitz to buy the UAB of Knoxville stock. Barr claimed he arranged for two loans to finance Schledwitz's stock purchases, and that Schledwitz would provide Barr with numerous bank notes and blank personal checks so Barr could make the interest payments for him. One loan for $300,000 was from UAB of Memphis and was later transferred to UAB of Hamilton County. By shifting the funds to different banks, the loans appeared current and were less suspicious to bank examiners. Barr also testified that a large portion of the loan proceeds from Schledwitz's loans either went directly to Jake Butcher or were used to pay Butcher's bills. Jake Butcher himself did not testify at Schledwitz's trial, apparently because both the government and Schledwitz were uncertain whether Butcher's testimony would have been favorable to their respective positions.

One of the most prominent government witnesses at trial was Jay Horne, who had retired from the Internal Revenue Service ("IRS") with twenty-five years experience as an investigator. Horne submitted to the court and jury that he had been (1) hired by the government, at the rate of $20.00 an hour, to review and analyze the financial records used by Schledwitz in his scheme and (2) subpoenaed by the federal government to explain the meaning of Schledwitz's financial documents to the jury. Although Horne testified that he had worked on "weekends and nights and vacation time" in reviewing Schledwitz's financial records, he gave no indication that he had done any additional work in the Schledwitz investigation other than analyzing documents. J.A. at

**2.** In *Brady,* the Supreme Court held that "suppression of evidence favorable to an accused person upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194.

190–92. Horne was the only expert witness to testify for the government.

The actual mail fraud theory charged in the first count in the indictment stemmed from a letter dated October 9, 1981 that Schledwitz wrote to Barr. The letter stated: "Dear Jesse, enclosed is an interest payment due on the note in [UAB of Hamilton County], please advise. Sincerely, Karl A. Schledwitz." J.A. at 370. Barr testified that this letter was Schledwitz's way of asking him where to get the money to pay his loans. *Id.* at 371. Additionally, the bank issued Barr a renewal note on Schledwitz's loan since Barr was handling the note for Schledwitz.

On September 24, 1992, the jury convicted Schledwitz on all three remaining counts of mail fraud. He was sentenced to six months in a halfway house. On direct appeal, a panel of this court affirmed Schledwitz's conviction in an unpublished per curiam opinion. *See United States v. Schledwitz*, No. 92–6314, 1993 U.S App. LEXIS 34009, 1993 WL 533559 (6th Cir.1993). Schledwitz subsequently sought a writ of certiorari from the Supreme Court, but the Court declined to issue the writ. *Schledwitz v. United States*, 512 U.S. 1207, 114 S.Ct. 2679, 129 L.Ed.2d 814 (1994).

*D. The Rule 33 Motion and Schledwitz II*

On August 17, 1994, Schledwitz filed a motion for a new trial in the district court pursuant to Fed.R.Crim.P. 33 based on newly discovered evidence. Schledwitz contended that despite his request for *Brady* material, including a specific request for statements made by Jake Butcher, the government had withheld information tending to exculpate him. Specifically, William Ramsey, who was Jake Butcher's attorney, told Schledwitz's counsel that Butcher had been interviewed by Federal Bureau of Investigation ("FBI") agents concerning Schledwitz's role in the scheme. Ramsey was present at the interview, which took place on October 29, 1985 while Butcher was in federal custody in Atlanta, Georgia. The contents of the interview were memorialized in a "302 Report." J.A. at 768–80.

According to the FBI's 302 Report, Jake Butcher was questioned extensively about Schledwitz's involvement with Butcher and his banks. The 302 Report reveals that Butcher told the agents that he had approached Schledwitz as a friend to offer him some bank stock that Butcher's other friends wanted to sell. Although Butcher admitted that he frequently assisted others in financing purchases of stock, Butcher could not remember whether he arranged financing for Schledwitz. J.A. at 769. Moreover, the 302 Report shows that Butcher asserted that he did not tell Schledwitz that he (Butcher) would take care of the interest on the loans. *Id.* at 771. Finally, Butcher denied that Schledwitz held the bank stock as a "trustee" for him. *Id.*

In addition to the substance of the 302 Report, Ramsey asserted in an affidavit that the FBI agents present were distressed that Butcher did not inculpate Schledwitz. Ramsey's affidavit also recalls that, at one point, an FBI agent suggested to him that Butcher could "help himself" by remembering criminal activities involving Schledwitz. *Id.* at 767. Moreover, the 302 Report revealed that Horne, the government's apparently disinterested expert at Schledwitz's trial, was present during the Butcher interview. *Id.* at 768.

In his Rule 33 motion, Schledwitz contended that the 302 Report clearly contained exculpatory *Brady* material which the government was obligated to disclose.[3] Schledwitz's trial attorneys stated in joint and separate affidavits that the presence of the 302 Report would have radically altered their trial strategy. They asserted that they knew Jake Butcher was an available witness, but because Butcher was a federal parolee at the time of the 1992 trial, they had no guarantee whether or not he would fashion his testimony in a manner favorable to the government. Accordingly, they did not call Butcher to testify at trial. With the prior statements contained in the 302 Report, the defense team would have been more likely to call Butcher as a defense witness. Additionally, Schledwitz argued that the 302 Report would

3. The government responded that a copy of the 302 Report was provided to Schledwitz during his trial proceedings in Memphis with Congressman Ford. However, the district court eventually found against the government on this point.

have served to impeach the testimony of Horne, since it would have demonstrated that Horne was not a disinterested expert paid only to analyze documents at trial, but rather, an involved and active participant in the government's investigation against him.

On January 31, 1995, the district court denied Schledwitz's Rule 33 motion based upon the newly discovered 302 Report. Again, Schledwitz appealed to this court and again a panel denied him relief in an unpublished per curiam opinion. *United States v. Schledwitz*, Nos. 95-5309, 95-5409, 1995 U.S.App. LEXIS 37039, 1995 WL 712755, at **5-6 (6th Cir.1995) (*"Schledwitz II "*). In that decision, we held that (1) the 302 Report was not "material" evidence because Schledwitz had to have been aware of Butcher's favorable opinions contained therein; and (2) the impeaching evidence against Horne did not undermine our confidence in the outcome of the trial. *Schledwitz II*, 1995 U.S.App. LEXIS 37039 at **16-18, 1995 WL 712755.

Schledwitz subsequently filed a petition for a rehearing *en banc.* Although the petition was denied, two judges dissented. The dissenting judges believed that Schledwitz's case presented a "serious case of unconstitutional prosecutorial misconduct," and pondered, "[i]f this *Brady* violation is immaterial and does not make any difference, then when will such a violation make a difference?" *United States v. Schledwitz*, 86 F.3d 73, 74, 76 (6th Cir.1996) (Merritt, C.J., dissenting from the denial of rehearing *en banc* ). Again, Schledwitz filed a petition for a writ of certiorari from the Supreme Court, which again declined to issue the writ. *Schledwitz v. United States*, 519 U.S. 948, 117 S.Ct. 357, 136 L.Ed.2d 249 (1996).

*E. The § 2255 Motion*

The instant appeal involves allegations that the government failed to disclose even more *Brady* material. In 1985, Memphis attorney Ray Beliles, who was Schledwitz's law partner at the time, was interviewed by two IRS agents-one of whom was Horne-regarding Congressman Ford and a 1979 trust agreement with Schledwitz involving UAB stock. J.A. at 802-03. Recounting the interview in an affidavit, Beliles told the agents that he knew of no illegalities or improprieties in the trust agreement. He further asserted that Schledwitz was not acting as a "nominee" for the Butchers in purchasing the stock. *Id.* at 804-05. Additionally, Beliles told the IRS agents that "Mr. Schledwitz consistently represented the bank stock . . . as his own." *Id.* at 804. Neither the substance of the Beliles interview, nor the fact that Horne assisted in the interview, was disclosed to the defense before Schledwitz's trial.

The second piece of additional evidence was an affidavit from former Memphis travel agent Herbie O'Mell. In an affidavit, O'Mell stated that sometime around 1985, Horne contacted him via telephone to seek evidence regarding the alleged gambling activities of Schledwitz and the Butcher brothers. O'Mell responded that he could not recall ever arranging a Las Vegas trip for Schledwitz. Again, neither the substance of this interview, nor the fact that it was conducted by Horne, was disclosed to the defense before Schledwitz's trial.

In his § 2255 motion, Schledwitz argued that the cumulative effect of the government's failure to disclose the 302 Report, the Beliles and O'Mell interviews, and Horne's involvement in the investigation deprived Schledwitz of a fair trial. The government responded that, among other things, the district court was precluded from reviewing Schledwitz's *Brady* challenges since this court had already rejected those arguments in *Schledwitz II.* In an order issued on August 5, 1997, the district court determined that it was not precluded from reconsidering the 302 Report because Schledwitz had offered additional facts concerning the extent of Horne's involvement in the investigation. J.A. at 899. Proceeding accordingly, the district court made the following findings:

(1) The 302 Report was exculpatory. *Id.* at 897.

(2) Jake Butcher was a "wild card that neither side dared to play," and it was not clear if Schledwitz would have called Butcher as a witness even if he had been armed with the prior statements in the 302 Report. *Id.* at 901.

(3) Horne was presented at trial as a neutral, disinterested expert and, because of that, was allowed to remain in the courtroom during the trial and permitted to be

recalled to the stand at the close of the government's proof. *Id.*

(4) Horne was the government's "key" witness against Schledwitz. *Id.* at 901.

(5) Beliles's comments to Horne were exculpatory of Schledwitz. *Id* at 898–99.

(6) O'Mell's evidence also exculpated Schledwitz. *Id.* at 899.

(7) There was no question that the jury would have viewed Horne in a different light if it had seen him as an investigator. *Id.* at 901.

(8) The court would not have allowed Horne to remain in the courtroom, while other witnesses were sequestered, if it knew that Horne had been intimately involved in the investigation against Schledwitz. *Id.*

(9) The government's handling of Horne was intentionally misleading. *Id.*

(10) Schledwitz's case for a new trial was stronger than it was during *Schledwitz II. Id.*

Despite these findings, and its obvious disapproval of the government's handling of the case, the district court denied to grant Schledwitz a new trial because of its view that "[n]othing disclosed since the trial changes the overwhelming fact that Mr. Schledwitz never had personal income sufficient to justify the 1.5 Million Dollars in loans he received from the Butcher banks. The Court does not believe that, in the absence of the government's misconduct, there is a reasonable probability that the outcome of the trial would have been different." *Id.* at 902.

The government subsequently moved for a modification of the district court's order, particularly the portions explicitly finding misconduct on the part of the government. On September 25, 1997, the district court denied the government's motion. Because the government did not appeal this order, we will accept the district court's August 5, 1997 memorandum order as containing the findings of fact and conclusions of law that we must now review. In the same September 25, 1997 order, the district court also granted Schledwitz a certificate of appealability, expressing its opinion that "Schledwitz has made a substantial showing that he was denied a constitutional right to a fair trial with both his allegations that the United States failed to disclose exculpatory evidence and his claim that it falsely portrayed its key witness as a neutral and disinterested expert." J.A. at 1248.

This timely appeal followed.

## II. Standard of Review

 To prevail under § 2255, a defendant must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The court renders *de novo* review of decisions granting or denying relief under § 2255, and reviews a district court's findings of fact for clear error. *Nagi v. United States*, 90 F.3d 130, 133–34 (6th Cir.1996); *Cardinal v. United States*, 954 F.2d 359, 362 (6th Cir.1992).

## III. Analysis

### A. "Materiality" Standard

 Pursuant to the rule enunciated in *Brady v. Maryland*, the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *See United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). Moreover, it is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir.1997) (*en banc*). However, "not every failure to disclose evidence favorable to the defense requires a reversal of a conviction." *United States v. Veksler*, 62 F.3d 544, 550 (3d Cir.1995).

 When the defendant, as in this case, asserts that the newly discovered *Brady* evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was "material." *United States v. Frost*, 125 F.3d 346, 382 (6th Cir.1997). In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court clarified the "materiality" analysis. The Court explained that a showing of materiality does not require the sup-

pressed evidence in question establish the defendant's innocence by a preponderance of the evidence. Rather, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555; *Frost,* 125 F.3d at 382–83 (6th Cir.1997). Nor does the defendant need to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555; *United States v. Smith,* 77 F.3d 511, 515 (D.C.Cir. 1996) (materiality requirement is not a sufficiency-of-the-evidence test).

▮ Instead, any favorable evidence, regardless of whether the defendant has made a request for such evidence, is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *Frost,* 125 F.3d at 382. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375; *United States v. Presser,* 844 F.2d 1275, 1281 (6th Cir.1988). Moreover, in determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the "reasonable probability" test is met. *Kyles,* 514 U.S. at 436, 115 S.Ct. 1555; *Frost,* 125 F.3d at 383.

## B. Res Judicata Effect of Schledwitz II

▮ The government asserts that Schledwitz's " § 2255 petition is essentially a rehash of his motion for a new trial that this Court rejected." Gov't Br. at 22. We agree that this appeal presents many of the same substantive issues that were raised in *Schledwitz II.* In ordinary circumstances, it would seem that *res judicata* principles would govern the disposition of this appeal. *See United States v. Moored,* 38 F.3d 1419, 1421–22 (6th Cir. 1994) (under "law of the case" doctrine, a district court is precluded from revisiting issue that was expressly or impliedly decided

by appellate court). However, this case, as Schledwitz himself puts it, is "admittedly rare" in that it involves additional *Brady* violations that were not considered by this court in *Schledwitz II.* Given that *Kyles* mandates that the question of whether the undisclosed evidence meets the "materiality" standard must be considered in the aggregate, we agree with the district court's determination that *Schledwitz II* has only limited *res judicata* effect in this case.

## C. Collective Exculpatory Effect of the Undisclosed Evidence

In *Schledwitz II,* we considered whether the government had an obligation under *Brady* to disclose the contents of the Jake Butcher 302 Report. We ultimately determined that no such obligation existed because Schledwitz was aware of Butcher's opinions, but, for tactical reasons, made the decision not to subpoena him as a defense witness. *Schledwitz II,* 1995 U.S.App. LEXIS 37039, at *16, 1995 WL 712755, at *5; *see also United States v. Clark,* 928 F.2d 733, 738 (6th Cir.1991) (no *Brady* violation when defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence"); *United States v. Todd,* 920 F.2d 399, 405 (6th Cir.1990) (same). The panel made this decision despite assertions from Schledwitz's attorneys that they would have certainly called Butcher to the stand to testify if they had knowledge-which they did not-of Schledwitz's prior statements to the FBI. *See Schledwitz,* 86 F.3d at 75 (Merritt, C.J., dissenting from the denial of rehearing *en banc* ) ("There is no more effective tool of examination than a prior written statement in such circumstances"); *accord United States v. Mullins,* 22 F.3d 1365, 1375 (6th Cir.1994) (Jones, J., concurring) (arguing that while defendant had notice of witness's exculpatory statements, defendant would have been far more likely to utilize statements had he known of witness's undisclosed immunity deal with government).

With regards to the exculpatory statements given to the IRS by Beliles, the government makes the same argument that the substance of the Beliles interview could have

been discovered through due diligence on Schledwitz's part. The government argues that Schledwitz himself certainly knew what he did or did not tell Beliles, and in any event, Schledwitz's counsel during the Memphis trials, Kemper Durand, was present at the Beliles interview. Based on these circumstances, the government cites the proposition that the "government is not required to make a witness's statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony which he might furnish." *United States v. Di Giovanni*, 544 F.2d 642, 645 (2d Cir.1976).

▮ We can easily dispense of the government's argument that because the attorney who eventually represented Schledwitz at the Memphis trials was present at the Beliles interview, Schledwitz should be charged with notice of the interview. Durand apparently only attended the meeting between Beliles and the IRS agents in connection with representing the law firm in which Beliles and Schledwitz were principals. While it would have been preferable if Durand had remembered the interview and Beliles's exculpatory statements once he entered a representative relationship with Schledwitz and informed the defense team at Schledwitz's Greeneville trial of the Beliles statements, he cannot be faulted for not recalling the substance of the interview because at the time, he was not the role of guarding Schledwitz's best interests.

▮ The government's contention that Schledwitz "knows what he told [Beliles]" also misses the mark. According to Beliles's affidavit, he "remember[s] being questioned ... about a certain trust agreement, and in fact, knew that Mr. Schledwitz consistently represented the bank stock as referred to in the agreement as his own." J.A. at 804. The government interprets this statement to mean that Schledwitz directly told Beliles that he was responsible for the stock. Beliles could just as well have meant that he overheard Schledwitz speaking to others regarding the stock transaction, or was aware of Schledwitz's representations through some other second-hand way. Moreover, even assuming, as the government does, that Schledwitz did indeed tell Beliles that the

stock was his own, the government forgets that due diligence is still grounded in due process. *See, e.g., Evans v. Kropp*, 254 F.Supp. 218, 222 (E.D.Mich.1966) (McCree, J.) ("In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel") (quoting *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir.1964)). Whereas Horne's interview with Beliles was presumably memorialized and filed, the supposed conversations between Beliles and Schledwitz, upon which the interview was based, would have occurred anywhere from seven to fourteen years prior to Schledwitz's trial in 1992. And, of course, Schledwitz was certainly busy in the interim, being a co-defendant in two of perhaps the most highly-publicized trials in the State of Tennessee since Clarence Darrow and William Jennings Bryan met in 1925 in the Scopes Monkey Trial. We do not believe that due process stretches so far as to hold a defendant accountable for every conversation he has ever had in his lifetime regardless of the surrounding and intervening circumstances.

▮ We do find merit, however, in the government's contention that the O'Mell statements are of only marginal exculpatory value to Schledwitz. Schledwitz attempts to explain that the O'Mell statements would have countered the "government's freewheeling, casual, bank-robbing image of Mr. Schledwitz" presented at trial. Schledwitz Reply at 13. True, O'Mell stated that he could not recall arranging any gambling trips to Las Vegas for Schledwitz, but we see no relevance between such a statement and the government's charges that Schledwitz acted as Butcher's "nominee" in the bank frauds.

▮ Taken individually, none of the above evidence would appear to raise a "reasonable probability" that Schledwitz was denied a fair trial. However, as *Kyles* mandates, we must consider the collective exculpatory effect of the nondisclosed evidence. The essence of the government's case against Schledwitz was that he acted as Jake Butcher's "nominee" in several improper loans, thus defrauding the banks as corporate entities into making loans they would

not otherwise have made. A conviction for mail fraud requires proof of the following three elements:

(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts);

(2) involving a use of the mails and

(3) for the purpose of executing the scheme or attempting to do so.

*Frost,* 125 F.3d at 354. Further, merely borrowing more than one can repay is not in itself fraudulent, but rather, "a scheme to defraud must involve '[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right and which accomplishes the end designed.'" *United States v. Smith,* 39 F.3d 119, 121–22 (6th Cir.1994).

▮ In this case, the government had in its files two statements from witnesses— Jake Butcher and Beliles—who said that Schledwitz was not acting as Butcher's nominee.[4] These statements would have directly undercut the intent requirement for a mail fraud conviction. Schledwitz only presented one defense witness, Martin Grusin, who was director of the UAB of Memphis after the Butcher empire collapsed. Grusin explicitly testified that Schledwitz treated the loans "as his obligations." J.A. at 706. Grusin's testimony would have been bolstered had Schledwitz put Beliles as well as Butcher on the stand affirming that Schledwitz was not acting as a "nominee" when he procured the loans.

## D. Collective Impeachment Effect of the Undisclosed Evidence

▮ Schledwitz's other major argument is that he was denied a fair trial because the government intentionally misled the court by presenting Horne as a "neutral and disinterested" expert, when, in fact, Horne had been

actively and intimately involved in the investigation against Schledwitz *since at least* 1985. In particular, Horne was present during the FBI's interview with Jake Butcher, and Horne himself conducted the interviews with Beliles and O'Mell. As the district court found, the jury would most certainly have viewed Horne in a different light had they known that he was not simply hauled out of retirement to testify about documents, but instead had been involved in the Schledwitz case for quite some time.

In *Schledwitz II,* Schledwitz made the same argument to this court with regards to the Jake Butcher 302 Report. We concluded, however, that "this type of impeachment does not satisfy the *Bagley* materiality standard, and therefore does not require the granting of defendant's motion for a new trial." *Schledwitz II,* 1995 U.S.App. LEXIS 37039, at *17, 1995 WL 712755, at *5. Unfortunately, the *Schledwitz II* panel did not articulate the basis for its conclusion. We cannot tell whether the panel meant (1) that the *type* of impeaching effect of the 302 Report, that is, the very fact that Horne was involved in the investigation against Schledwitz, did not give rise to a material level; or (2) that the *quantity* of impeaching effect of the 302 Report, that is, the fact that Horne just happened to be present at one interview conducted by the FBI, did not give rise to a material level. This ambiguity was noted by the two judges who dissented from the denial of the rehearing en banc in *Schledwitz II.* See *Schledwitz,* 86 F.3d at 75–76 (Merritt, C.J., dissenting from the denial of rehearing en banc).

We are inclined to believe that the panel in *Schledwitz II* meant that Horne's merely being present, indeed, a passive observer, at one interview was not enough to entitle

---

4. Predicting that we would reconsider the exculpatory effect of the Butcher 302 Report, the government asserts that Butcher's statements disavowing that Schledwitz was a nominee is undermined by the fact that he could not recall many key events regarding the circumstances of the Schledwitz loans. We acknowledge that the 302 Report reveals many failures of recollection on the part of Butcher, but this goes to the weight of the evidence, not its favorable tendency. See *Kyles,* 514 U.S. at 451, 115 S.Ct. 1555. Likewise, the government characterizes the Be-

liles interview as "unimportant," obviously seeking to downplay its significance in the investigation. Gov't Br. at 28. Regardless, the district court still found that the statements given by Beliles were exculpatory. In any event, the Supreme Court has pronounced that if a prosecutor has doubt about certain evidence's exculpatory value, the prosecutor should err on the side of disclosure. *Kyles,* 514 U.S. at 439, 115 S.Ct. 1555; *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Schledwitz to a new trial. The Supreme Court has made clear that there is no distinction between exculpatory evidence and impeachment evidence for *Brady* purposes. *See Kyles,* 514 U.S. at 433, 115 S.Ct. 1555; *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375. This is not a situation in which a defendant is arguing that the testifying investigator was biased against him merely because of his role as an investigator. *See, e.g., State v. Miller,* 187 Ariz. 254, 928 P.2d 678, 682 (App.1996) ("A police officer is not per se 'interested' merely by virtue of his or her involvement in a criminal investigation[.]"). Rather, Schledwitz argues, and the district court found, that the government intentionally placed Horne in a false light by portraying him as a neutral and disinterested expert whose sole purpose in the Schledwitz case was to review various financial records and explain the meaning of the documents to the jury.

Bias is always relevant in assessing a witness's credibility. *United States v. Lynn,* 856 F.2d 430, 432 n. 3 (1st Cir.1988); *Villaroman v. United States,* 184 F.2d 261, 262 (D.C.Cir.1950). The Supreme Court has defined bias as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). Bias is not limited to personal animosity against a defendant or pecuniary gain. Courts have found bias in a wide variety of situations, including familial or sexual relationships, employment or business relationships, friendships, common organizational memberships, and situations in which the witness has a litigation claim against another party or witness. *See* WEINSTEIN'S FEDERAL EVIDENCE §§ 607.04[5]-[7] (1997) (collecting cases). Although neither the government nor Schledwitz cites a case directly on point, and we could not find such a decision through our own independent research, we are of the opinion that if a witness has been extensively involved in a criminal investigation against a defendant, and is presented at trial as a neutral, detached expert against that defendant, then the witness's previous involvement

qualifies as "bias," and the defendant is entitled to expose such bias pursuant to Fed. R.Evid. 607.[5]

In this case, the district court found that Horne "was presented to the Court, the jury, and the defense counsel, as a former IRS criminal investigator, with a 30–year background in accounting, brought out of retirement and paid $20.00 an hour to review bank records supplied by the government and to trace the flow of money in order to assist the United States in the preparation of its case." J.A. at 1249 (Order Denying Government's Motion to Modify). Given our understanding that the panel in *Schledwitz II* believed that the impeachment value of the 302 Report was not of sufficient quantity to be a material *Brady* violation, we believe that Schledwitz has now met that threshold by producing evidence that Horne himself interviewed Beliles and O'Mell.

In response to Schledwitz's charges that with its vast resources, the government could easily have found a truly disinterested expert to perform Horne's task at trial, the government explained that "[t]he advantage of using Horne over someone else was that he was intimately familiar with the documents and could put them in context." Gov't Br. at 35 n. 19. This explanation only underscores Horne's extensive involvement in the investigation. Had the defense team known that Horne had investigated Schledwitz for years, it certainly would have sought to elicit that fact on cross-examination. Such impeachment would have dissipated the false impression that Horne was not a garden-variety neutral expert, but rather an active investigator involved in the case.

The government makes a similar argument with regards to the exculpatory effect of the undisclosed evidence, by contending that Schledwitz should have been aware of Horne's role in the investigation since he had met Horne previously on at least two occasions. The first was in 1985, when Horne was investigating possible tax violations relating to the collapse of the Butcher banks. The second was during Schledwitz's

**5.** Rule 607 states: "The credibility of a witness may be attacked by any party, including the party calling the witness." FED.R.EVID. 607.

Memphis trials, where Horne apparently was an observer. The district court determined that, even assuming these meetings should have alerted Schledwitz that Horne might have been intimately involved in the investigation at his 1992 trial, it still did not excuse the government's intentional misconduct of presenting Horne as a neutral witness. J.A. at 1249. We see no reason to disturb this conclusion.

Moreover, the government's presentation of Horne as a neutral witness is all the more egregious because Horne, as found by the district court, was the "key" witness against Schledwitz. J.A. at 901. In *Kyles*, the Supreme Court indicated that depriving a defendant of the opportunity of utilizing damaging and impeaching evidence against an "essential" witness should be considered in the due process analysis. *Kyles*, 514 U.S. at 445–46, 115 S.Ct. 1555. The government challenges the characterization of Horne's trial role as "key" since Horne did nothing more at trial than trace the paper trial left by Schledwitz in the alleged scheme, whereas several other witnesses gave testimony tending to show that Schledwitz's loans were improper. This point is certainly accurate as far as it goes, but Horne was also the only expert witness at the trial,[6] was the government's first witness to testify, and was the only witness that the government recalled to the stand. Since the district court was in the unique, first-hand position to observe the trial's proceedings, we cannot say that its characterization of Horne as the "key" witness was clearly erroneous.

### E. Total Cumulative Effect of Undisclosed Evidence

Whether or not either the collective exculpatory value or the collective impeaching value of the undisclosed evidence in this case could meet the *Kyles* "reasonable probability" test of materiality is a close call. However, taking the entire cumulative effect into account, we are of the opinion that the standard has been met in this case.[7]

Schledwitz's trial counsel filed affidavits in the district court stating that they would have "radically altered [their] trial strategy" if they been aware of the undisclosed evidence. J.A. at 808, 817. Had the government provided the defense team with the 302 Report as well as the O'Mell and Beliles statements, the defense would have likely to called these two additional witnesses to testify. If believed, the witnesses' testimony would have influenced the jury to acquit Schledwitz of the charges of mail fraud. Moreover, the defense would certainly have dispelled the impression of neutrality and impartiality that was left by the government's presentation of Horne.

The government contends, and the district court agreed, that in spite of any *Brady* errors, the evidence against Schledwitz was still so overwhelming that there is no reasonable possibility that the verdict would have been different. We disagree. The closest to a "smoking gun" that the government produced against Schledwitz to support its theory that Schledwitz was a "nominee" was the October 9, 1981 letter that Schledwitz wrote to Jesse Barr informing him that Schledwitz had received an interest due notice from UAB of Hamilton County and that Barr should "please advise" on the note. As the government observes, people generally pay interest that they owe; they do not ask others what they should do regarding a due notice.

But the basis of the "overwhelming" evidence, at least in the district court's view, was that Schledwitz obtained $1.5 million in

---

6. The government protests that Horne was never qualified as an expert. But the record reveals that the district court allowed Horne to be recalled on the witness stand even though he had not been sequestered as were the other witnesses because the district court considered Horne an impartial expert with no interest in the outcome of the trial. J.A. at 503.

7. The dissent argues that "[i]f one cumulates several pieces of evidence which are not *Brady* material, the whole body of that evidence does

not then become *Brady* material." But this is precisely what happened in *Kyles*. The Court of Appeals evaluated each item of potentially exculpatory evidence, and concluded that none of the proffered evidence satisfied *Brady*'s materiality standard. However, after criticizing the Court of Appeals for engaging in "a series of independent materiality evaluations," the Supreme Court viewed the same evidence in the aggregate and found a *Brady* violation. *See Kyles*, 514 U.S. at 441–54, 115 S.Ct. 1555.

loans during a time when his income did not justify such loans. That one has borrowed more than he or she can repay does not, in itself, establish mail fraud-nor any other crime for that matter. Intent is a requisite of mail fraud. The undisclosed evidence would have invalidated the intent element of the government's proof against Schledwitz. Given such, and given the district court's own conclusion that there was "no question" that the jury would have viewed Horne differently had it known that he had been an active investigator against Schledwitz, we are thus of the opinion that a "reasonable probability" exists that the result of Schledwitz's trial would have been different. Too many doubts arise from the government's *Brady* violations, and we cannot say we have confidence in the outcome of this trial.

Having decided that due process has been offended in this case,[8] we believe that the Supreme Court's admonition to the government in *Brady* bears repeating here:

> The principle of [due process] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' A prosecution that withholds evidence on demand of an accused, which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That cases the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice[.]

*Brady*, 373 U.S. at 87–88, 83 S.Ct. 1194 (footnote omitted).

## IV. Conclusion

For the reasons stated herein, the district court's denial of Schledwitz's § 2255 motion is **REVERSED** and his conviction for mail fraud **VACATED**.

SILER, Circuit Judge, dissenting.

I respectfully dissent, for I believe that there are insufficient grounds for the granting of the motion to vacate in this case.

First, as the majority opinion indicates, this court affirmed the conviction on direct appeal and the Supreme Court declined to grant certiorari. Then, Schledwitz filed his motion for a new trial under Criminal Rule 33 because the prosecution allegedly failed to provide him with exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In that case, the evidence which was supposed to have been material and withheld was an FBI report of an interview with Jake Butcher and the failure to reveal the fact that retired IRS agent Jay Horne had participated in part of the investigation of the case. The district court's denial of Schledwitz's motion for a new trial was upheld by this court in *United States v. Schledwitz*, Nos. 95–5309, 95–5409, 1995 WL 712755 (6th Cir.1995) (*Schledwitz II*). We held that the FBI report of the interview was not material evidence under *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), because Schledwitz "had to be aware of Butcher's opinion contained in the FBI 302 report." *Schledwitz II*, 1995 WL 712755, at *5.

That previous decision of our court should be the "law of the case." *See United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994). Under that doctrine, "issues, once decided, should be reopened only in limited circumstances." *Id.* Such circumstances were specifically noted as " 'substantially different evidence raised on subsequent trial; a subsequent contrary view of the law by the controlling authority; or a clearly erroneous decision which would work a manifest injustice,' " *Id.* (citing *White v. Murtha*, 377 F.2d 428, 431–432 (5th Cir. 1967)). None of those circumstances has arisen in this case. Therefore, I would apply the law of the case doctrine and follow our previous decision in *Schledwitz II*.

Admittedly, in this motion to vacate, Schledwitz has presented two additional

---

**8.** Schledwitz also raised a claim of prosecutorial misconduct along with the *Brady* violations to support his habeas motion. We find that the

prosecutorial misconduct charge is substantively identical to the *Brady* claims and in any event, mooted by our decision on the *Brady* issues.

pieces of evidence, claiming a violation of the *Brady* rule. The first piece of new evidence is the statement of former Memphis travel agent Herbie O'Mell. Even the majority opinion questions the materiality of that statement. O'Mell could only testify that he did not recall ever arranging a trip to Las Vegas for Schledwitz. Schledwitz contends that the prosecution should have revealed such an interview by Horne with O'Mell to show not only the substance of the interview but also that Horne was investigating a part of the case. However, the prosecution never tried to prove that Schledwitz had taken a trip to Las Vegas; it merely showed that some of the money that was received by Schledwitz went to pay the Las Vegas gambling debts for C.H. Butcher. Moreover, even if the prosecution had intended to prove that Schledwitz had gone to Las Vegas, O'Mell was not the only travel agent who could have arranged such a trip to Las Vegas for Schledwitz. Although the district court found that O'Mell's evidence was exculpatory for Schledwitz, I would find that finding to be clearly erroneous, for there is no value to that testimony.

The second item of new evidence submitted in the motion to vacate is the statement from Ray Beliles, Schledwitz's law partner, reflecting an interview with two IRS agents in 1985. In that interview, Beliles told the agents he knew of no illegalities or improprieties in the trust agreement involving Schledwitz and that Schledwitz was not a "nominee" for the Butchers in purchasing the stock. This statement by Beliles added nothing to Schledwitz's case. In addition, as a law partner, Beliles had a close relationship to Schledwitz. Therefore, Schledwitz could have ascertained any knowledge of the investigation that Beliles possessed. The prosecution has no obligation to turn over information that the defendant was, or should have been, aware of. *See United States v. Todd,* 920 F.2d 399, 405 (6th Cir.1990).

Schledwitz reiterates his argument in his original motion for a new trial, that is, that the prosecution should have revealed the fact that Horne had participated in part of the investigation. We held previously: "[T]his type of impeachment does not satisfy the *Bagley* materiality standard and, therefore, does not require the granting of defendant's

motion for a new trial." *Schledwitz II,* 1995 WL 712755, at *5. Therefore, if it did not satisfy the *Bagley* materiality in our previous decision, it does not satisfy the *Bagley* materiality in the present decision, which involves the same case and the same type of evidence.

Even if this court should consider the cumulative effect of all of this evidence upon Schledwitz's trial, there still is no *Brady* violation here. If one cumulates several pieces of evidence which are not *Brady* material, the whole body of that evidence does not then become *Brady* material.

I believe that the district court erred when it found that the government violated *Brady* by withholding the FBI reports of the interviews of Butcher, O'Mell and Beliles. However, the district court was confident that the evidence against Schledwitz was overwhelming. Thus, the court was convinced that even had the prosecution presented these FBI reports to the defense before or during trial, the outcome of the trial would have been the same.

Therefore, I would follow our previous decision in *Schledwitz II* and the district court's decision in this case and affirm the district court's denial of the motion to vacate.