OPINION
Defendant-appellant, Gordon L. Reynolds, appeals a decision of the Columbiana County Common Pleas Court denying his petition for postconviction relief and request for an evidentiary hearing.
On April 21, 1995, a jury found appellant guilty of one count of aggravated murder by prior calculation and design (R.C. 2903.01), two death specifications (R.C. 2929.04[A][3] and [A][8]), and a firearm specification (R.C. 2941.141[A]). These charges stemmed from the death of Lynn Hanna who was murdered in 1988. The penalty phase began on April 26, 1995, and the jury recommended that appellant be sentenced to death. The trial judge sentenced appellant to death on April 28, 1995.
On direct appeal, this Court affirmed appellant's conviction and sentence. State v. Reynolds (Jan. 4, 2001), Columbiana App. No. 95-CO-30, unreported, 2001 WL 15790.
Appellant filed a petition for postconviction relief and request for an evidentiary hearing on January 28, 1998. Plaintiff-appellee, State of Ohio, represented by the Columbiana County Prosecutor's Office, filed no answer, and on March 4, 1998, the trial court overruled appellant's petition and denied appellant's request for an evidentiary hearing. On June 19, 1998, appellant filed a motion to have the trial court issue findings of fact and conclusions of law pursuant to R.C. 2953.21(G). The trial court issued its findings of fact and conclusions of law on July 29, 1999. This appeal followed.
Appellant raises two assignments of error which are interrelated and share common issues of legal analysis; therefore, they will be addressed together. Appellant's first assignment of error states:
 "The Trial Court Erred in Denying the Petition Without a Hearing, for the Petition and the Evidentiary Material Appended to It Clearly Made Out a Prima Facie Case of a Constitutional Violation."
Appellant's second assignment of error states:
 "The trial court erred in denying Appellant a hearing on his petition, thus depriving Appellant of liberties secured by U.S. Const. amend. XIV and Ohio Const. art. I, §§ 1, 2, 10, and 16, including meaningful access to the courts of this State."
Appellant argues that the trial court erred in denying his petition for postconviction relief without first conducting an evidentiary hearing. Appellant argues that he made a prima facie showing that the verdict rendered in the trial court is void or voidable under both the United States and Ohio Constitutions. Appellant contends that the prosecutor concealed and failed to properly disclose material evidence which appellant could have used to impeach key State witnesses. Appellant states that it explicitly asked appellee to disclose any inducements or "deals" that appellee had made with witnesses.
In response to appellant's requests, appellant argues that appellee failed to disclose to appellant that it had struck a deal with two key State witnesses. Appellant argues that it produced sufficient evidence of these "deals" including but not limited to, copies of checks issued by Columbiana County Sheriff Richard J. Koffel and Columbiana County Prosecuting Attorney Robert Herron to Gordon Springer for an amount totaling $5,000.00.
Appellant argues that the foregoing evidence demonstrates that the prosecution failed to comply with its affirmative disclosure obligations as set forth by the United States Supreme Court in a series of decisions in Brady v. Maryland (1963), 373 U.S. 83, Giglio v. United States
(1972), 405 U.S. 150, United States v. Bagley (1985), 473 U.S. 667, andKyles v. Whitley (1995), 514 U.S. 419. Appellant argues that the aforementioned evidence was material to the resolution of appellant's guilt, and as such, appellee had an affirmative obligation to disclose this information to appellant. Therefore, appellant argues that the trial court abused its discretion in failing to grant appellant a postconviction evidentiary hearing.
In response to appellant's arguments, appellee argues that appellant was not automatically entitled to a postconviction relief evidentiary hearing. Appellee argues that the trial court's finding of fact and conclusions of law provide an accurate picture of the evidence before the trial court, and as such, appellee argues that appellant failed to establish that the denial of an evidentiary hearing violated any of his constitutional rights.
R.C. 2953.21, which governs petitions for postconviction relief, provides:
"(A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
"* * *
"(C) * * * Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. The court reporter's transcript, if ordered and certified by the court, shall be taxed as court costs. If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal.
"(D) Within ten days after the docketing of the petition, or within any further time that the court may fix for good cause shown, the prosecuting attorney shall respond by answer or motion. Within twenty days from the date the issues are made up, either party may move for summary judgment. The right to summary judgment shall appear on the face of the record.
"(E) Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues even if a direct appeal of the case is pending. * * *"
A criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing. State v. Cole (1982), 2 Ohio St.3d 112, 113. "Before granting an evidentiary hearing on the petition, the trial court shall determinewhether there are substantive grounds for relief (R.C. 2953.21[C]),i.e., whether there are grounds to believe that `there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.'" (Emphasis added.) R.C. 2953.21(A)(1)." State v. Calhoun
(1999), 86 Ohio St.3d 279, 282-83. Therefore, before a hearing is granted, the petitioner bears the initial burden of submitting evidentiary documents containing sufficient operative facts that demonstrate the merit of his claims. See id.
Appellate review of a trial court's disposition of a petition for postconviction relief is a hybrid one presenting mixed questions of law and fact. State v. Smith (Sept. 24, 1999), Trumbull App. No. 98-T-0097, unreported, 1999 WL 778376 at *3; State v. Akers (Sept. 9, 1999), Lawrence App. No. 98 CA 33, 1999 WL 731066 at *7.[1] The trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. Judgments will not be reversed, as being against the manifest weight of the evidence if they are supported by some competent, credible evidence. Gerijo, Inc. v. Fairfield (1994),70 Ohio St.3d 223, 226; C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus. Upon accepting such findings of fact, an appellate court then independently determines the propriety of the trial court's conclusions of law.
"`Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" Kyles v. Whitley
(1995), 514 U.S. 419, 422, quoting Burger v. Kemp (1987), 483 U.S. 776,785. Prosecutorial misconduct may support a R.C. 2953.21 petition for relief. State v. Singerman (1996), 115 Ohio App.3d 273, 276, citingState v. Walden (1984), 19 Ohio App.3d 141.
Crim.R. 16(B) controls when determining what evidence the prosecution must turn over to a defendant during discovery. While this section of the rule contains seven subsections, only the following two are relevant to the present case:
"(B) Disclosure of evidence by the prosecuting attorney
"(1) Information subject to disclosure.
"* * *
"(c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant.
"* * *
"(f) Disclosure of evidence favorable to defendant. Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. * * *" (Emphasis added.)
In Brady v. Maryland (1963), 373 U.S. 83, the United States Supreme Court developed a rule of law, often referred to as the "Brady rule," which imposes upon a prosecutor a due process duty to disclose evidence favorable to the accused. Specifically, the court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. "Impeachment evidence, * * * as well as exculpatory evidence, falls within the Brady rule." United States v.Bagley (1985), 473 U.S. 667, 676. In subsequent decisions, the court defined the parameters of the Brady rule by expanding on the concept of materiality.
In Bagley, the court held that the materiality test requires "a reasonable probability" that, had the disclosure been made, the "result of the proceeding would have been different." Bagley, 473 U.S. at 682. The court added, "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id.
This concept of materiality was explored and narrowed further by the court in Kyles v. Whitley (1995), 514 U.S. 419. In Kyles, the court elaborated at length on the Bagley definition of "materiality," stating:
"Four aspects of materiality under Bagley bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal * * *. * * * Bagley's touchstone of materiality is a `reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A `reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression `undermines confidence in the outcome of the trial.' Bagley,473 U.S. at 678, 105 S.Ct. at 3381.
"The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show aBrady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. * * *
"Third, we note that * * * once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. * * *
"The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item. * * *" Kyles, 514 U.S. at 434-36.
The materials submitted in support of appellant's Brady claim included the sworn statement of Gordon Springer, copies of checks issued from the Columbiana County Sheriff and the Columbiana County Prosecutor to Gordon Springer, and other documentary evidence indicating that Gordon Springer had agreed to testify as a witness for the State in exchange for compensation and consideration. The evidence submitted in support of appellant's petition for postconviction relief establishes the following chain of events.
At trial, Gordon Springer testified that appellant told him that he had killed Lynn Hanna, "cut her up and throwed [sic] her in the river." (Tr. 3075-76.) Gordon Springer further testified that he had been indicted, convicted, and later incarcerated on marijuana charges in the state of West Virginia, but was testifying as a state witness while out on appeal bond. (Tr. 3078-3081.) Gordon Springer testified on direct examination that he received no compensation for agreeing to testify for appellee. Specifically, Gordon Springer stated:
 "Q. At some point in time were you contacted by the authorities?
"A. Yes, sir.
"Q. And did you agree to cooperate?
"A. Yes, sir.
 "Q. As a result of that cooperation, have you been promised anything whatsoever?
"A. No, sir, I have not.
"* * *
"Q. Have you, indeed, cooperated with authorities?
"A. I have to my fullest.
 "Q. That cooperation, have you received any monetary compensation for that?
"A. No, sir, I haven't.
 "Q. Has any monetary compensation whatsoever been promised to you?
"A. No, sir." (Emphasis added; Tr. 3081-3082.)
Gordon Springer further reaffirmed this testimony on cross-examination:
 "Q. Now, you have decided that you are sitting in jail, facing a prison term of one to five, to cooperate in this investigation.
"A. Yes, sir.
 "Q. And as a result of that, you get in touch with Sheriff Koffel —
"A. Yes.
"Q. — and as a result of that, you set a deal?
 "A. There's been no deal struck yet." (Emphasis added; Tr. 3095-3096.)
Richard Thomas (a.k.a. Rick Thomas), appellant's friend of thirty-two years, also provided similar incriminating testimony at appellant's trial. Rick Thomas testified that appellant admitted to him that he had killed Lynn Hanna:
 "He said, `Rick, I had to do it. I had to kill her, Lynn Hanna, because of a fire.' And he said, hisself, [sic] and the other two girls; Lynn Hanna and Kim, set the fire. He had to kill Lynn Hanna because she was gonna go to the authorities and tell. Then, he went on and said, after he cut her up, he took her heart out and talked to her heart. And said to it, `If you would have treated me better things would have been different.'" (Tr. 3237.)
When asked if he had received any compensation for his testimony, Rick Thomas provided the following testimony:
 "Q. Was it at that point in time that you agreed to cooperate with the State of Ohio after conversing with Sheriff Koffel or talking with Sheriff Koffel?
"A. I volunteered.
"Q. Were you promised anything —
"A. No.
"Q. — in consideration for your volunteering?
"A. No." (Tr. 3239-3240.)
* * *
 "Q. Rick, as a result of your cooperation taping Gordon Reynolds did you receive any monies?
"A. I believe three hundred dollars.
"* * *
 "Q. Over and above these monies have you received anything else from the County Sheriff's Office, or any other law enforcement agency?
"A. No, sir." (Emphasis added; Tr. 3242.)
Much like Gordon Springer, Rick Thomas also reaffirmed this testimony on cross-examination:
 "Q. Rick, you've testified that all you're going to ever receive is that three hundred dollars, is that right?
"A. Right.
 "Q. Have you ever heard — you haven't been promised anything else?
"A. Certainly not.
"Q. You're not going to receive anything else?
"A. Not that I know of.
"Q. No reward that you know of?
"A. Nothing." (Emphasis added; Tr. at 3261-3262.)
In addition to the foregoing testimony, Sheriff Koffel also testified that Gordon Springer and Rick Thomas had not been offered any additional promises or compensation in exchange for their testimony. In reference to Gordon Springer, Sheriff Koffel testified:
 "Q. And did you make any requests that charges be dismissed against Gordon Springer?
"A. No.
"* * *
 "Q. Did you promise anything, whatsoever, [to Gordon Springer] at that point in time on February 19th or excuse me May 19th of 1994?
"A. No." (Emphasis added; Tr. 2918.)
Sheriff Koffel also testified that Rick Thomas had also not been offered any additional compensation outside of the $300.00, which Rick Thomas had received as compensation for wearing a wire:
 "Q. Okay. Now, those three exhibits total a total of three hundred dollars cash; is that correct?
"A. Yes.
 "Q. And that was the sum, — total sum of money paid to Richard Thomas as the result of his cooperation with the Columbiana County Sheriff's Department and other law enforcement authorities in the investigation of this aggravated murder.
"A. Yes.
 "Q. Did he receive any other consideration in any way shape or form, other than outlined in those three documents?
"A. No." (Emphasis added; Tr. 2951.)
A review of the record indicates that Gordon Springer and Rick Thomas were the only individuals to whom appellant allegedly told that he had murdered Lynn Hanna. A review of the record also demonstrates that the wires worn by Gordon Springer and Rick Thomas produced "nothing of evidentiary value." (Tr. 2962, 3007, and 3259.)
In his petition for postconviction relief appellant alleged, amongst other claims, that the prosecution 1) failed in its affirmative obligation to turn over Brady material, and 2) that various witnesses had perjured themselves while testifying at trial. Appellant attached the sworn statement of Gordon Springer to his petition for postconviction relief. In this statement, Gordon Springer stated that he had committed perjury in court when he had stated that he was not offered anything in exchange for testifying against his father. In fact, Gordon Springer provided evidence that he had reached an agreement with appellee and per the terms of that agreement, had received monetary compensation in exchange for testifying against appellant.
Gordon Springer's statement also raises other issues as well. Gordon Springer's statement raises questions as to the truthfulness of Rick Thomas's testimony that he did not receive additional compensation for his cooperation with appellee. Gordon Springer also stated that appellee instructed him to lie under oath, and say that Gordon had not reached an agreement with the prosecution.
Gordon Springer's statement provides in relevant part:
 "Q. Okay — and you were called as a State's witness, were you not? You were called by the State, against your father, correct?
"A. That's not correct. I was forced.
 "Q. All right — bad choice of words on my part. I guess what I'm getting at is it was the State that brought you in to testify as opposed to the defense lawyers?
"A. Yes, sir.
 "Q. * * * Can you tell me, generally, the types of questions they asked you, and what you responded to those question as you best recall?
 "A. They asked me if my father had ever told me anything about it — and I said, yes, he had. And they asked me what. I told them on St. Clair Avenue, he said he had killed — on St. Clair Avenue in East Liverpool, he said he had killed Lynn Hanna.
"* * *
 "Q. And were you asked questions about whether or not you had been promised anything or received anything in consideration of your testimony?
"A. Yes, sir. I was.
"* * *
 "Q. Do you remember — I'm not trying to hold you to anything specific, but as best you recall — the types of questions that he asked you about that?
 "A. He was asking me if I was offered anything to testify against my father.
"Q. And what did you tell him about that?
"A. Under oath, I said no.
 "Q. And I understand, from talking to you, that may not have been accurate.
 "A. Absolutely was not accurate." (Emphasis added; Petition to Vacate or Set Aside Conviction and Sentence, Statement of Gordon Springer 4-6.)[2]
Gordon Springer then went on to discuss the circumstances and events that lead up to his cooperation with appellee:
 "A. I was arrested in West Virginia for possession with intent to deliver, and a delivery charge for marijuana.
"* * *
"Q. So about a year before your dad's trial?
 "A. I'm hell on dates and stuff, but I'd have to say a year.
"* * *
 "A. * * * They got me in the back of the cruiser, and one of the very first questions was — we don't have to take you to New Cumberland, Mr. Springer.
"* * *
 "A. Well, they said they don't have to take me to New Cumberland because they wanted to know a little bit about Gordon's [my] father.
"* * *
 "A. * * * I said, what does this involve? He said, murder. I said, get the car headed to New Cumberland. They took the car to New Cumberland. I would not talk to them.
"* * *
 "Q. During that several weeks[3], did anybody — any law enforcement people try to initiate any further conversations about Gordon Reynolds?
"* * *
 "A. Well, they came in and out, in and out — hell, I didn't know if I was coming or going. They kept wanting to talk — talk about Gordon Reynolds. I told them I didn't know nothing about the murder — didn't know nothing." (Stmt. 6-9.)
Gordon Springer also discussed the circumstances that lead him to testify as a witness for appellee at Gordon Reynolds's trial:
 "Q. Now, jumping ahead if you will. Tell me about who contacted you specifically about testifying in Gordon's trial?
"A. Sheriff Koffel."
* * *
 "Q. Tell me, then, how you knew about that, Gordon. How did you learn about why you were going to Weirton?[4]
 "A. I hadn't had a choice because they were going to give me ten (10) years — two (2) to ten (10) years — and told me I was going to do every bit of ten (10) years if I didn't tell them what I knew.[5]"
* * *
 "A. In Weirton, I made a statement on a tape recorder at the Weirton Police Department down there — I seen it. I know what my father is capable of." (Stmt. 14, 15, and 18.)
Springer then testified as to his first meeting with the Columbiana County Prosecutor:
 "Q. [T]ell me the next thing that happened as far as you becoming a witness in your father's case.
 "A. I believe I told them that I'll not go no further without a lawyer putting this contract together because they're offering me everything to testify.
 "Q. When you say they, you are talking about Mr. Beatty, or you're talking about Sheriff Koffel, or both?
 "A. I'm talking about Columbiana County — the Prosecutor and Sheriff Koffel.
 "Q. Now you brought up a word that we haven't talked about yet, which is prosecutor. When did you first have any contact with anybody from the Prosecutor's office?
 "A. Somewhere along the line, they did meet me in New Cumberland at a dungeon-like place, and talked to me down there. * * *
"* * *
 "Q. Is there someone downstairs at this meeting from the Prosecutor's office?
"A. Yes, sir.
"Q. Can you tell me who?
"A. Sheriff Richard Koffel —
"* * *
"A. — and there was also Robert Herron.
"* * *
 "Q. All right. Can you tell me, Gordon, what you remember about that meeting? What was discussed?
 "A. Well, I didn't want to talk to nobody because I did not have a lawyer representing me. They're promising the world, and nothing is in writing yet, and I wanted it in writing.
 "Q. All right. Now when you say they're promising you the world, be a little more descriptive for me if you would. Tell me what they are promising you.
 "A. It's not really the world, but it's twenty-five thousand dollars ($25,000.00) reward that was offered in solving of the Lynn Hanna murder case, and the complete relocation, and charges were supposed to be dismissed in West Virginia.
 "Q. The charges that you're already serving a sentence on?
"A. Yes, sir.
"Q. Not new charges, or anything like that?
"A. No. sir. * * *
 "Q. Okay — and are they asking you to do something, Gordon, in exchange for the twenty-five thousand ($25,000.00) — and they offer you to be relocated; is that it?
"A. Yes, sir.
 "Q. And are they asking you to do something, or do they ask you at that point in time to do anything?
 "A. They said just go home and set back for six (6) months.
"Q. Home, being —
"A. Chester, West Virginia — my residence.
"Q. In other words, you would get out of jail?
"A. Yes.
 "Q. And those are the things they are promising you when you say they promised you the world?
"A. Yes, sir.
"* * *
 "A. They said they would relocate us — drop all charged in West Virginia. * * *
"* * *
 "A. He said we could keep our home in Chester, sell it, rent it out, give it to my mother — do whatever I wanted with it. He would relocate us from A to Z.[6] I said, what does relocation from A to Z mean? We would set you up in another house — wherever you want to go. So instead of sitting here with your thumb up your ass, get out looking. He said to save all receipts. I ran down to Arkansas and looked around at a couple of homes down there, came back. I still got the receipts. Everything was pretty much quiet for a long time." (Emphasis added; Stmt. 20-24.)
As noted supra, Gordon Springer stated that he did not want to cooperate with appellee until he retained a lawyer. Gordon Springer retained Attorney Walter Angelini to negotiate the terms of his "deal" with appellee. Gordon Springer stated that Attorney Walter Angelini reached a deal with the prosecutor. Attorney Angelini drew up an agreement between Gordon Springer and Herron whereby Gordon agreed to cooperate with appellee in exchange for certain consideration. A copy of the agreement is attached to Gordon Springer's statement. The agreement provides in pertinent part:
 "Regarding the above referenced matter this missive is to confirm the agreement to be as follows:
 "1. The above noted witness shall cooperate truthfully and fully with your office and local authorities.
 "2. That said cooperation by G.S. shall not unreasonably be withheld and that he will testify if deemed necessary by your office.
 "3. That your office will assist with the reasonable relocation of G.S. after trial.
 "4. That G.S. shall be entitled to the full reward offered in this matter, under the guidelines that the reward is offered.
 "5. That the office of the Prosecutor of Columbiana County, Ohio shall pay for the legal fees of Angelini and Angelini, at the rate of $120.00 per hour. It is estimated that the time shall not exceed 10 hours.[7]
 "If the above is agreeable to you then please endorse this fax transmission and fax same to my office, #(304) 723-15039 (sic). Due to the sensitivity of the relevant investigation the fax copy shall be considered as valid as an original." (Petition to Vacate or Set Aside Conviction and Sentence, Stmt. Exhibit 1.)
Gordon Springer stated that Attorney Angelini faxed a copy of the agreement to Herron. However, Springer also stated that Herron did not return a copy of the fax to Attorney Angelini. (Stmt. 33.) However, Gordon Springer presented additional evidence of partial performance by Herron of this agreement. In addition to payment in the form of checks by Koffel and Herron, Gordon Springer produced a billing statement from the firm of Angelini and Angelini to Robert L. Herron, Columbiana County Prosecutor, for 18.2 hours of legal services for Gordon Springer totaling $2,184.00. (Petition to Vacate or Set Aside Conviction and Sentence, Stmt. Exhibit 2.) Gordon further stated that this bill had been paid in full. (Stmt. 35.)
Gordon Springer then went on to discuss the way in which appellee prepped him for appellant's trial. Gordon Springer stated that appellee instructed him to deny that he had struck a deal with appellee:
 "Q. * * * Is there any other area or any other questions that they told you what to say, or how to answer?
"A. No, sir.
 "Q. Did they talk to you about — maybe the defense lawyers asking you if you had been promised anything, if you made a deal — anything like that?
 "A. I'm sorry. Yes, there was other questions. [sic] Yes, there was. There was a deal struck, but my answer under oath was no, because I was to say no because I was to fully cooperate with them. And here on Exhibit One (1), you will see where I was to fully cooperate with them, and they told me if I didn't answer it that way, I would be facing ten (10) years in the penitentiary.
 "Q. Do you remember — it's kind of important if you can remember who said that.
 "A. I believe it was the Prosecutor — which one, I'm not sure. There was so much going on at this time. That was the way I was going to answer the question, otherwise there would be a mistrial if the jurors and everybody else would know I had been offered anything. Sheriff Koffel told me, with his own mouth, that there would have been a mistrial.
 "Q. Do you remember the Prosecutor saying that, too?
"A. No, sir." (Stmt. 43-44.)
As noted supra, at trial Gordon Springer denied that he had been promised anything or received any consideration in exchange for his testimony. (Tr. 3081-3082 and 3096.)
After appellant was convicted, Gordon Springer alleged that appellee breached its deal with him:
 "A. * * * The Sheriff, Koffel, and the Prosecutor, and the whole gang from Columbiana County was supposed to be there for me. Nobody showed up down there for me but my lawyer."
* * *
 "A. * * * I'm stuck in West Virginia with two (2) felony charges on my record here, four and a half (4 1/2) years of probation, and a fifty-two hundred ($5,200.00) fine. I have to go back to school and get a GED. I also have to go see a psychiatrist, and I also have to go to DUI — or some AA meetings.
"Q. And those are all conditions of your probation.
 "A. Yes, sir — because now I'm on probation. They slammed the gavel on my father everything changed." (Stmt. 37 and 33).
Gordon also stated that he believed that appellee breached its financial promise to him as well:
"Q. After you testified, did you receive any money?
"A. After I testified — yes, sir, I did.
 "Q. Okay. Let me hand you what we have marked again for our discussion tonight, as Exhibit Number Three (3). That's a photocopy of a check. Have you seen that before?
"* * *
 "A. That came from Richard Koffel. It's a twenty-five hundred dollar ($2,500.00) check dated March 2, 1995 — Check Number 533. It's from Citizens Banking Company. It's made out to me, Gordon Springer.
 "Q. Did you receive the original of this check, Gordon?
"A. Yes, sir, I did.
"Q. Did you cash it?
"A. Yes, sir, I did.
"* * *
 "Q. How did receive the check? Was it by mail? Was it personally delivered to you?
 "A. I was gone from my residence at the time and came home, and my fiancée said — Mr. Koffel dropped this off, and you're not going to be very happy about that.
"Q. He said that to your fiancée?
"A. My fiancée said that to me.
"* * *
"Q. Why weren't you going to be happy?
 "A. Because there was supposed to be a full reward, and full relocation, and what the hell you going to do with this?
 "Q. What did you understand the full reward to be?
 "A. The full reward was twenty-five thousand dollars ($25,000.00). I seen it on television.
 "Q. And what did you understand the relocation to be?
 "A. From A to Z — he said I wouldn't even have to touch a piece of furniture in my house. He'd have movers come and do it all.
"* * *
 "Q. I'm assuming from that, that there's some conversation between Sheriff Koffel and your fiancée?
"A. It's over.
"* * *
 "A. * * * I called out there raising hell about it. He [Sheriff Koffel] said Mr. Herron was out of town, and he would be more than glad to give me another twenty-five hundred dollar ($2,500.00) check.
 "Q. Let me hand you what we have marked as Exhibit Four (4). That's also a photocopy of a check isn't it?
"A. Yes, sir.
 "Q. That's from Mr. Herron's account for twenty-five hundred dollars ($2,500.00).
"A. Yes. It was dated 5-23-95, Check Number 3706.
"Q. And did you receive the original of that check?
"A. Yes, sir * * *. * * *
 "Q. * * * Did you cash that check — the one that's marked as Exhibit Four (4) — the original of that?
"A. Yes, sir, I did. I cashed both of them.
 "Q. How did you receive the one from Mr. Herron? That is, was it mailed to you? Did somebody drop it off? Did you pick it up?
 "A. If I recall right, I went out and picked it up. He was nowhere around, but it was there at the office.
 "Q. Okay. Were you told anything else, other than what you have related to me about that being the end of the deal?
"A. Yes — it's over.
"Q. Who told you that?
 "A. Sheriff Koffel — don't make something out of it that it isn't. Don't make a mountain out of it.
"* * *
 "Q. Did you assume from that, that right was going to be that they could come up with the twenty-five thousand dollars ($25,000.00)?
"A. Oh, yes." (Stmt. 46-51.)
Finally, Gordon Springer also stated that Rick Thomas, who also testified that he had received no compensation or consideration,[8] had also received compensation in exchange for his testimony similar to the monetary compensation received by Gordon Springer:
 "Q. Have you had any individual conversations with Rick since then?
"A. Yes, sir.
"* * *
 "Q. Did Rick tell you anything about Gordon's trial, or about what he got, or what he was supposed to get?
"A. Well, he was going to get completely relocated.
"Q. So he was supposed to get relocated like you?
"A. And a nice check.
 "Q. Okay — and he hasn't gotten that either. He got two (2) twenty-five hundred dollar ($2,500.00) checks like you did?
 "A. He might think that's a nice check, but it's nothing." (Stmt. 57-58.)
Gordon Springer's foregoing statement when viewed in light of the attached exhibits (i.e., the cooperation agreement written on the stationery of Angelini and Angelini [Exhibit 1], the billing statement sent by Angelini and Angelini to Herron, [Exhibit 2], and the checks drawn on the accounts of Sheriff Koffel and Prosecutor Herron [Exhibits 3 and 4]), indicate that appellee may have struck a deal with Gordon Springer in exchange for his testimony. This evidence could have operated as impeachment evidence favorable to the accused as it went to the witnesses' credibility and pecuniary motive in testifying against appellant. Despite its apparent obligation to disclose this evidence to appellant, appellee is being accused of purposely concealing this evidence.
As noted supra, the failure to disclose impeachment evidence raises concern over a Brady violation, only if the suppressed evidence is "material". Applying the materiality test as set forth in Kyles v.Whitley (1995), 514 U.S. 419, suppression of the impeachment evidence in this case may have constituted a Brady violation, and as such, the trial court erred in denying appellant's request for a postconviction evidentiary hearing.
As noted supra, the touchstone of materiality under Bagley is a "reasonable probability" of a different result. Bagley, 473 U.S. at 678. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence defendant received a fair trial. Kyles, 514 U.S. at 434. A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. Id.
There is a reasonable probability that had appellee notified appellant of the allegedly suppressed evidence, a different result would have been reached. A review of the record shows that appellant's conviction was founded upon circumstantial evidence. No direct or forensic evidence was presented linking appellant to the crime. Instead, appellee's case rested primarily upon the testimony of two witnesses, Gordon Springer, appellant's son, and Rick Thomas, appellant's friend of thirty years. Both Gordon Springer and Rick Thomas testified that appellant stated to each of them that he had killed and dismembered Lynn Hanna. Each of the witnesses provided colorful and incriminating testimony against appellant. Gordon Springer testified that appellant told him that he had killed Lynn Hanna, "cut her up and throwed [sic] her in the river[,]" (Tr. 3075-76) while Rick Thomas testified:
 "He [appellant] said, `Rick, I had to do it. I had to kill her, Lynn Hanna, because of a fire.' And he said, hisself, [sic] and the other two girls; Lynn Hanna and Kim, set the fire. He had to kill Lynn Hanna because she was gonna go to the authorities and tell. Then, he went on and said, after he cut her up, he took her heart out and talked to her heart. And said to it, `If you would have treated me better things would have been different.'" (Tr. 3237.)
No other corroborating witnesses testified to the same. In addition, the "wires" worn by both Gordon Springer and Rick Thomas produced "nothing of evidentiary value." (Tr. 2962, 3007, and 3259.)
A review of appellant's petition for postconviction relief demonstrates that Gordon Springer's and Rick Thomas's testimony, relationship, and cooperation with appellee raises issues of bias which are always relevant in assessing a witness's credibility. Schledwitz v. United States (C.A.6 1999), 169 F.3d 1003, 1015. "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." United States v. Abel (1984), 469 U.S. 45, 51.
The deals, which Gordon Springer and Rick Thomas allegedly entered into with appellee, would have given them a direct, personal, and pecuniary stake in appellant's conviction. Proper disclosure of Springer and Thomas's alleged deal with appellee would place their testimony in an entirely different light. As noted by the U.S. Supreme Court in Kyles:
"Disclosure of their statements would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. To begin with, the value of two of those witnesses would have been substantially reduced or destroyed." Kyles, 514 U.S. at 441.
The jury was entitled to view such evidence when assessing the credibility of the witnesses, and such information may have raised a reasonable probability of a different result.
In addition, the evidence of the alleged deals between appellee, Gordon Springer, and Rick Thomas also raises questions as to the credibility of other State witnesses as well. The alleged deals between appellee, Gordon Springer and Rick Thomas raise questions as to the truthfulness of certain portions of Sheriff Koffel's testimony. As noted supra, Sheriff Koffel essentially testified that he had offered or promised no additional consideration in exchange for the testimony of Gordon Springer and Rick Thomas. Specifically, Koffel testified:
 "Q. And did you make any requests that charges be dismissed against Gordon Springer?
"A. No.
"* * *
 "Q. Did you promise anything, whatsoever, [to Gordon Springer] at that point in time on February 19th or excuse May 19th of 1994.
"A. No." (Emphasis added; Tr. 2918.)
Sheriff Koffel also testified that Rick Thomas had also not been offered any additional compensation outside of the $300.00 for wearing the wire:
 "Q. Okay. Now, those three exhibits total a total of three hundred dollars cash; is that correct?
"A. Yes.
 "Q. And that was the sum, — total sum of money paid to Richard Thomas as the result of his cooperation with the Columbiana County Sheriff's Department and other law enforcement authorities in the investigation of this aggravated murder.
"A. Yes.
 "Q. Did he receive any other consideration in any way shape or form, other than outlined in those three documents?
"A. No." (Emphasis added; Tr. 2950-2951.)
This testimony appears to conflict with the evidence set forth in Gordon Springer's statement establishing that Sheriff Koffel did compensate Gordon Springer and Rick Thomas in exchange for their testimony. This contradiction between the evidence attached to appellant's petition for postconviction relief and Sheriff Koffel's testimony raises issues of credibility as to the testimony of Sheriff Koffel.
Gordon Springer's statement also seems to conflict with a portion of the testimony at trial given by Tammy Springer, wife of Gordon Springer. Tammy Springer testified at trial to the following:
 "Q. Was anything promised to you, personally, in regard to your cooperation in this matter?
"A. No.
 "Q. In your presence, was anything promised to your husband, to cause him to cooperate in this matter.
"A. No." (Tr. at 3298-99.)
Gordon Springer's statement to the contrary indicates, at the very least, that his wife, Tammy Springer, may have been well aware of the deal that he had struck with appellee. Gordon Springer stated that his wife was the person who went out and obtained Attorney Angelini to represent him in his negotiations with the prosecutor and sheriff:
 "Q. The lawyer [Attorney Angelini] wasn't someone of your choosing. Sheriff Koffel chose him — or do you know?
 "A. If I believe right, my sister and my fiancée at the time, Tammy Moffo and Tammy Cheuvront [Springer] went and located this lawyer in Weirton, West Virginia." (Stmt. 24-25.)
Additional testimony by Gordon Springer also demonstrated Tammy Springer's familiarity with her husband's cooperation agreement. In reference to Sheriff Koffel delivering the $2,500.00 check for relocation expenses, Gordon Springer indicated his wife's reaction: "She [Tammy Springer] more or less said it's over. This is all you're going to get for doing it for the son's-a-bitches." (Stmt. 48.)
The favorable evidence to appellant, specifically the compensation and consideration given to Gordon Springer and Rick Thomas, can reasonably be taken as to undermine the testimony and credibility of several key witnesses, and can also reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
On the remand of United States v. Bagley (1985), 473 U.S. 667, reversed and remanded as, Bagley v. Lumpkin (C.A.9 1986), 798 F.2d 1297, the Ninth Circuit Court of Appeals recognized the impact of the government's concealment and failure to disclose evidence as to the bias of the government's key witnesses. The court noted:
"It is inconceivable that evidence of perjury would not, as an objective matter, affect a factfinder's assessment of a witness' credibility. When the evidence shows that the government's only witnesses lied under oath, it is contrary to reason that confidence in the outcome of the case would not objectively be undermined. * * * Evidence of bias and prejudice is certainly material for impeachment, but lies under oathto conceal bias and prejudice raise the impeachment evidence to such alevel that it is difficult to imagine anything of greater magnitude thatwould undermine confidence in the outcome of any trial." (Emphasis added.) Id. at 1301.
While this decision is not controlling in our jurisdiction, its logic and analysis bears emphasis as the court's discussion raises and addresses the very issues presented before this court today. In the casesub judice, the very concerns noted above are called to the court's immediate attention. Appellant has presented sufficient evidence and material illustrating several possible instances of prosecutorial misconduct and perjury that raise issues and questions beyond the validity of Gordon Springer's testimony and implicate fundamental concerns of due process. Deliberate deception of court and jury by presentation of testimony that is known to be perjured coupled with the state's failure to afford corrective judicial process to remedy the wrong when discovered by reasonable diligence would constitute deprivation of liberty without due process. Mooley v. Holohan (1935), 294 U.S. 103. This impeachment evidence was essential to the jury's assessment of credibility, and as such, this favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury's verdict.
Appellee argues that the trial court did not abuse its discretion in denying appellant's motion for postconviction hearing. In particular appellee argues that the trial court made a correct analysis of the Brady
issue in its finding of fact and conclusion of law.
In its July 29, 1999 findings of fact and conclusion of law, the trial court issued the following findings that provided in pertinent part:
 "It should be noted that in the statement of October 25, 1995, Gordon Springer the witness involved never indicates that his testimony at trial with regard to the fundamental issues of this case was false. In addition, a review of the record as a whole indicates that three other corroborating witnesses,[9] Gordon Springer's wife Tammy Chevront Springer, his sister Tammy Moffo and his brother-in-law James Moffo each also supported his version of events as testified to at trial. The record further reveals that Rick Thomas, a friend of the Defendant/Petitioner, who testified for the state, related to the jury that he was paid, prior to the trial a sum of cash money for his efforts aiding the state and such an admission was before the jury in their deliberation.[10] In order for a constitutional violation to occur based upon the tests as set forth in United States vs. Bagley and interpreted later in Kyles v. Whitley, 514 U.S. 419
(1995). A reasonable probability of a different result gives rise to the touchstone issue of materiality.
 "In reviewing all of the evidence as a whole in this matter, the Court finds that the non disclosures complained of are not material in nature in that they do not give rise to a reasonable probability of a different result. The record as a whole reveals that the Defendant/Petitioner in this matter received a fair trial resulting in a verdict worthy of confidence."
The trial court erred in its analysis of appellant's Brady argument. In determining that appellant failed to establish a Brady violation, the trial court noted:
 "It should be noted that in the statement of October 25, 1995, Gordon Springer the witness involved never indicates that his testimony at trial with regard to the fundamental issues of this case was false.
 In addition, a review of the record as a whole indicates that three other corroborating witnesses, Gordon Springer's wife Tammy Chevront Springer, his sister Tammy Moffo and his brother-in-law James Moffo each also supported his version of events as testified to at trial."
This portion of the trial court's entry demonstrates that the trial court evaluated appellant's Brady argument under a sufficiency of the evidence test. The trial court essentially concludes that there was sufficient collaborating evidence outside of Gordon Springer's testimony to find appellant guilty of murder.
The trial court's analysis of the Brady issue was explicitly rejected by the United States Supreme Court in Kyles v. Whitley (1995),514 U.S. 419. As noted supra, the U.S. Supreme Court stated:
"The second aspect of Bagley materiality bearing emphasis here is thatit is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show aBrady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidencecould reasonably be taken to put the whole case in such a different lightas to undermine confidence in the verdict."
Any one of Gordon Springer's statements or the exhibits attached to appellant's petition may not have been sufficient to warrant a hearing on the postconviction petition, if considered in isolation. However, when considered together, the possibility that appellee concealed evidence, submitted perjured testimony that Gordon Springer and Rick Thomas did not receive compensation in exchange for their testimony, and failed to disclose Gordon Springer's and Rick Thomas's pecuniary interest or personal stake in appellant's conviction created issues, which when viewed in the totality of the circumstances, could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. As such, the petition and supporting materials raise a genuine issue whether the state violated appellant's due process rights under Brady. The trial court erred in refusing to hold an evidentiary hearing. Although this evidence may not be sufficient to ultimately prove the allegations presented here, appellant must be afforded his day in court.
Accordingly, appellant's assignments of error are found to be with merit.
The judgment of the trial court is hereby reversed and this matter is remanded with instructions to proceed with appellant's postconviction relief evidentiary hearing and a subsequent and full reconsideration of his petition in light of the evidence adduced.
Waite, J., concurs.
DeGenaro, J., concurs; see concurring opinion.
[1] This court, as have others, has routinely stated that the trial court's decision with respect to a postconviction relief petition will not be reversed absent an abuse of discretion. However, such cases do not accurately state the standard of review applicable to petitions for postconviction relief. As the Eleventh District observed:
"The adjudication of claims for relief predicated on alleged violations of the petitioner's constitutional rights is not a matter that falls exclusively within the trial court's discretion. For instance, the trial court may dismiss a claim for relief based on res judicata grounds. On review, the court of appeals must determine as a matter of law whetherres judicata functioned as a bar to the claim for relief." Smith, 1999 WL 778376 at *3, fn. 2.
Similarly, in State v. McKinnon (Jan. 29, 2001), Columbiana App. No. 99-CO-11, unreported, 2001 WL 69214, this court noted that an allegedBrady violation was to be reviewed under a due process analysis rather than the abuse of discretion analysis.
[2] Hereinafter referred to as "Stmt."
[3] Gordon Springer remained in jail for nearly a month before making bond on the first indictment of marijuana charges. (Stmt. 8-9.)
[4] Gordon Springer stated that he was taken from the Hancock County jailhouse to the Weirton police station to meet with Sheriff Koffel. (Stmt. 14-15.)
[5] Gordon Springer also stated that he was convicted on either the second or third indictment on 1) a charge of intent to deliver, and 2) on a delivery charge of marijuana. (Stmt. 15-16.) Prior to being taken to Weirton, Gordon met with Mr. Beatty, possibly a federal agent, who allegedly stated that if Gordon Springer did not cooperate, he would be charged with conspiracy to commit murder. (Stmt. 17.)
[6] Appellant also presented evidence supporting Gordon Springer's statement that appellee agreed to pay for Gordon Springer's relocation expenses. Appellant attached copies of two checks payable to Gordon Springer. One was a check for twenty-five hundred dollars ($2,500.00) from Robert Herron, Columbiana County Prosecutor, and the other check was from Richard J. Koffel, Columbiana County Sheriff, also payable to Gordon Springer in the amount of twenty-five hundred dollars ($2,500.00). A memo on Sheriff Koffel's check reads "Sheriff's Share of Relocation Expenses." (Petition to Vacate or Set Aside Conviction and Sentence, Stmt. Exhibits 3 and 4.)
[7] The legal fees referred to in this paragraph represent the legal fees accrued from Angelini and Angelini's representation of Gordon Springer in connection with his legal problems with the West Virginia authorities.
[8] As noted supra, Rick Thomas testified that he received three hundred dollars ($300.00) as compensation for wearing a wire, but Rick Thomas also stated that he hadn't been promised anything else. Seesupra.
[9] As noted supra, Rick Thomas and Gordon Springer were the only witness to actually testify that appellant told them that he murdered Lynn Hanna.
[10] Also, as noted supra, Rick Thomas testified that he received three hundred dollars ($300.00) as compensation for wearing a "wire." However, Rick Thomas also testified that he received no other compensation, a claim that Gordon Springer seems to rebut in his statement.