**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kwan Andre WINSTON, Tirrell Clemmons, Defendants–Appellants.**

Nos. 01–1611, 01–1612.

United States Court of Appeals, Sixth Circuit.

Jan. 23, 2003.

Before KRUPANSKY, SILER, and COLE, Circuit Judges.

## OPINION

COLE, Circuit Judge.

Defendant–Appellants Kwan Andre Winston and Tirrell Clemmons appeal their convictions and sentences following a

jury trial for several crimes relating to cocaine trafficking and a resulting murder. Winston and Clemmons were tried together in the United States District Court for the Western District of Michigan, Southern Division, for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, 848, and 18 U.S.C. §§ 2, 924(c), (j) (2002). Individually and jointly, they assert several assignments of error in the trial proceedings. Winston argues that the district court abused its discretion in denying his motion for a mistrial based on a violation of the *Bruton* rule. Clemmons asserts four assignments of error: (1) the district court abused its discretion in denying his motion for a new trial based on the nondisclosure of impeachment evidence under *Brady*, (2) the district court erred in admitting into evidence certain statements made by Clemmons; (3) the district court erred in giving the jury instructions under *Pinkerton* for Clemmons's liability for the homicide of Shamon Figures; and (4) trial counsel rendered ineffective assistance. Jointly, Winston and Clemmons assert two assignments of error: (1) the district court erred in its instruction to the jury on the definition of "malice aforethought;" and (2) the district court erred in denying Defendants' Joint Motion to Set Aside the Verdict and Dismiss Count 3 of the indictment.

For the following reasons, we AFFIRM the convictions and sentences on all counts.

## I. BACKGROUND

### A. Facts

Winston and Clemmons were members of a street gang and were involved in the sale of cocaine, crack cocaine and marijuana in southwest Michigan. Shamon Figures was Winston's primary supplier of crack cocaine and Davonn Hartfield, another member of the gang, also bought crack cocaine from Figures. On the after-noon of February 20, 1997, Hartfield told Winston that Figures was coming to his house in Grand Rapids, Michigan to sell him cocaine. Hartfield knew that Winston was having problems with his supply of crack cocaine from Figures and Winston agreed to meet Figures at Hartfield's house. Winston and Clemmons went to the home of Hartfield and waited for Figures. Immediately upon Figures's arrival at the Hartfield residence, Winston and Figures began arguing. The argument escalated and Winston struck Figures in the nose with a Glock semiautomatic pistol. Figures tried to escape by jumping through a window, but was shot by Winston and dragged into the kitchen. Clemmons entered the kitchen, pointed a gun at Figures, and demanded that he turn over the money and drugs that he owed Winston. Figures was then forced into the trunk of Hartfield's car where Winston shot him twice. As Winston was closing the trunk lid, his firearm accidentally discharged, shooting Clemmons in the chest.

Winston, with Figures in the trunk, drove Clemmons to the apartment of Kormarne Hassel. Hassel helped Clemmons out of the car and into his apartment, and Winston asked Hassel to call Antawin Fowler. Winston, with Figures still in the trunk, then drove to Fowler's residence. Police and medical technicians responded to Hassel's apartment and transported Clemmons to the hospital. At the hospital. Clemmons was treated for his gunshot wound and his clothes were seized for evidence. After arriving at Fowler's. Winston told him that Figures's body was in the trunk of his car. He then asked Fowler to follow him to Benton Harbor, Michigan, which is located about one hour and thirty minutes from Grand Rapids, in order to dispose of the body.

Fowler and Winston arrived at Ronald Evans's home in Benton Harbor. Teke-

shon Nelson, Winston's girlfriend, and Steve Parker were at the Evans residence when Winston and Fowler arrived. Upon Winston's direction. Fowler and Parker purchased tools and plastic bags in order for Winston to dismember Figures's body. After purchasing the tools they were directed by Winston to dig holes in which to dispose of the body. When they returned from digging the holes, Winston and Nelson had dismembered Figures's body and placed the parts in several plastic bags. Fowler and Parker took the bags to the holes they had dug, but failed to bury the bags completely. They returned to the Evans residence and burned the vehicle that once had contained the body of Figures. Figures's torso was later discovered and identified by DNA evidence.

### B. Procedural History

On November 10, 1999, Winston and Clemmons were indicted and charged with two counts in a Fourth Superseding Indictment: Count One charged them with conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846; (2002), and Count Three charged them with carrying and using a firearm in relation to a drug trafficking crime to commit murder in violation of 18 U.S.C. §§ 2, 924(c), 924(j) (2002). Winston was indicted on one additional charge in the Fourth Superseding Indictment; Count Two of the indictment charged him with participating in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (2002).

Winston and Clemmons were scheduled to be tried together. On October 10, 2000, the district court issued a Memorandum Opinion and Order addressing Winston's Motion for Severance, which was based primarily on the Government's proposed introduction of various statements by Clemmons. The district court denied Winston's Motion for Severance and ordered the Government to further redact several of Clemmon's statements as directed by the district court. After a fourteen-day trial, a jury returned guilty verdicts against Winston and Clemmons on all counts. On April 23, 2001. Winston was sentenced to terms of life in prison on each of Counts Two and Three, to be served concurrently. Clemmons was sentenced to terms of life in prison on each of Counts One and Three, to be served concurrently. On December 8, 2001, Winston and Clemmons filed a Joint Motion to Set Aside the Verdict and Dismiss Count Three of the Indictment under Fed.R.Crim.P. 33 (2002). On February 26, 2001, the district court denied the motion. Clemmons and Winston then filed timely motions for appeal.

## II. DISCUSSION

### A. *Bruton* Violation

Winston argues that the district court abused its discretion in denying his motion for a mistrial based on the admission of statements by Clemmons in violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We review a district court's denial of a motion for mistrial for abuse of discretion. *United States v. Ursery,* 109 F.3d 1129, 1133 (6th Cir.1997).

#### 1. Applicable Law

The *Bruton* rule was first announced by the Supreme Court in 1968 and its contours were refined by two subsequent Supreme Court cases in 1987 and 1998. In *Bruton,* the Supreme Court announced a rule to protect defendants who are tried jointly for the same crime from the possibility that the introduction of the co-defendant's confession may violate the Confrontation Clause of the Sixth Amendment. The Supreme Court in *Bruton* held that a limiting instruction that the jury should

consider only the confession with respect to the confessing defendant was insufficient to protect the rights of the non-testifying co-defendant. *Bruton*, 391 U.S. at 137, 88 S.Ct. 1620. The Supreme Court explained its reasoning, stating that:

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id* at 135–36, 88 S.Ct. 1620. (citations omitted).

The Supreme Court returned to the issue of the *Bruton* rule in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Richardson*, the Supreme Court limited the reach of the *Bruton* rule to statements that were incriminating on their face and expressly implicated the co-defendant. *Richardson*, 481 U.S. at 208, 107 S.Ct. 1702. The Court distinguished between confessions that were "incriminating on [their] face," and confessions "requiring linkages," and limited the *Bruton* rule to the former. *Id.* The Court held that the confessions made by the co-defendant in *Richardson* required additional evidence to link the other co-defendant to the case, and therefore there was no need for the protections of *Bruton* in such a case. *Id.*

The Supreme Court's decision in *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), is its latest refinement of the *Bruton* rule. *Gray* answered a question left open in *Richardson*— "whether redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within *Bruton's* protective rule." *Gray*, 523 U.S. at 192, 118 S.Ct. 1151. The name of the non-testifying co-defendant in *Gray* was removed and replaced simply with blank spaces. The blank spaces were referred to as "deleted" or "deletion" during oral testimony. *Id.* at 188, 118 S.Ct. 1151. The Court held that "[r]edactions that simply replace a name with an obvious blank space or a word such as "deleted" or a symbol or other similarly obvious indications of alteration . . . leave statements that . . . so closely resemble Bruton's unredacted statements that, in our view, the law must require the same result." *Id.* The Court reasoned that statements redacted in such a way were often obvious to the jury, unnecessarily alerted the jury to the redacted name, and directly accused the co-defendant. *Id.* at 193–194, 118 S.Ct. 1151.

The Court in *Gray* also suggested that the substitution of a neutral pronoun may save a redacted statement from being impermissible under *Gray*. Specifically, the Court provided as an example: in response to the question, "Who was in the group that beat Stacey?," the answer of "Me, deleted, deleted, and a few other guys" could have been changed to "Me and a few other guys." *Id.* at 196, 118 S.Ct. 1151. Prior to the decisions in *Richardson* and Gray, this Court found that the admission of a redacted statement of a co-defendant containing the word "blank" in place of the defendant's name violated the *Bruton* rule. *Hodges v. Rose*, 570 F.2d 643, 647 (6th Cir.1978) ("Although the other party is referred to as 'blank' in the redacted statement, the circumstances of the case and other evidence admitted virtually compel the inference that 'blank' is [the defendant].""). Following *Gray*, we have not ruled specifically on what would be accept-

able redactions to a confession under *Bruton*, though we continue to follow *Hodges*, as affirmed by *Gray*. However, several of our sister circuits have noted that a *Bruton* violation can be avoided by replacing the co-defendant's name with a neutral pronoun or other generalized phrase. *See, e.g., United States v. Logan*, 210 F.3d 820, 821–23 (8th Cir.2000) (defendant's name replaced with "another person" or "another individual"); *United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir.1999) (same); *United States v. Verduzco–Martinez*, 186 F.3d 1208, 1214 (10th Cir.1999) (defendant's name replaced with "another person"); *United States v. Taylor*, 186 F.3d 1332, 1335–36 (11th Cir.1999) (per curiam) (defendants' names replaced with "they" or the "captain").

### 2. Applying the *Bruton* rule

Winston argues that the introduction of certain statements made by Clemmons violated the *Bruton* rule. *See United States v. Bartle*, 835 F.2d 646, 651 (6th Cir.1987) (extending *Bruton* to include statements made by non-testifying co-defendants as well as their confessions). Specifically, Winston argues even though the district court redacted Clemmons's statement to eliminate the phrase "another individual/subject," the Government allowed its witness to testify twice that Clemmons arrived at Hartfield's residence "with another individual." Winston argues that the only person that Clemmons could have been referring to was Winston.

On September 29, 2000, the district court conducted a hearing to consider Winston's severance request and the *Bruton* issue in regard to several statements made by Clemmons. On October 10, 2000, the district court issued an Opinion and Order denying the severance request and ruling that Clemmons's properly redacted statements could be introduced at trial. The Government had suggested that Winton's name be replaced with neutral pronouns such as "others" or "someone" and the district court found this sufficient to avoid any *Bruton* violation. The district court also directed Clemmons's statement of "While Clemmons, Hartfield and this other person were inside the home. Shamon Figures arrived," to be changed to "While they were inside the home, Shamon Figures arrived." Finally, the district court ordered the Government to submit its proposed questions regarding Clemmons's statements to the court prior to the examination of the witnesses involved. At trial, one of Clemmons's statements was introduced through the testimony of Detective Carl Deland. When first asked to testify about Clemmons's statement, Deland testified:

Q. Okay. And what did Mr. Clemmons tell you about these events?

A. He had indicated that he was over at Davonn Hartfield's residence. He indicated that he had arrived there with another subject, not Marty Gilbert. He had indicated that he was in this house with Davonn Hartfield and the other subject.

The Government immediately terminated the questioning because it was not in compliance with the district court's order regarding redaction. The witness claimed that he did not understand that he was simply to read the statement as redacted. Winston's counsel moved for a mistrial and the district court ruled that he would correct the issue by telling the jury to disregard the statement. In its ruling, the district court said that it did not believe that the unredacted testimony violated *Bruton*, but that in an abundance of caution, he would instruct the jury. Deland was asked again to read Clemmons's statement and he stated, "Mr. Clemmons ad-

mitted that he was at Davonn Hartfield's house on February 20, 1997. Clemmons advised that he arrived at the house with another individual who was not Marty Gilbert. While Clemmons, Hartfield and...." The questioning was terminated a second time and in a sidebar, the Government admitted that it had not provided Deland with the court-redacted version of the statement. The district court overruled Winston's renewed motion for a mistrial and again instructed the jury to disregard the testimony. On the third attempt at questioning Deland, he testified in compliance with the court-redacted statement stating that "Clemmons advised that he had arrived at the house and was not with Mary [sic] Gilbert. While Clemmons was inside the home, Shamon Figures arrived...." Winston's counsel again moved for a mistrial and the district court denied the motion ruling that he continued to feel that even the statements as initially redacted did not violate the *Bruton* rule. The district court noted that he had ordered that the statements be redacted further "solely out of an extreme excess of caution."

The statements at issue in this case do not raise a traditional *Bruton* issue. As discussed previously, this Court has not ruled specifically on the types of redactions that avoid violations of *Bruton*. The district court noted that it had asked for further redactions of Clemmons's statements as a cautionary measure since "the Sixth Circuit hasn't ruled on [what types of redactions are acceptable under *Bruton* ] yet." The statement as read by Deland to the jury twice was redacted and any reference to Winston was replaced with the neutral pronoun "another subject/individual." Therefore, Winston is unable to claim that unredacted statements such as those at issue in *Bruton* were admitted against him at trial. Instead, Winston is actually making a claim under

*Gray* that Clemmons's statement as redacted was so close to the unredacted statement as to violate Winston's rights under *Bruton*. Winston argues that the Government's theory is that only four individuals were at Hatfield's residence the night of the shooting. Winston argues that by a process of elimination, "another subject/individual" could only be referring to Winston and because of this, a violation of *Bruton* occurred.

■ Though Deland read the wrong statement twice, Winston's claim must fail. In *Bruton*, the Court recognized that in many circumstances a limiting instruction will adequately protect one defendant from the prejudicial effects of the introduction at a joint trial of evidence intended for use only against a different defendant. *Bruton*, 391 U.S. at 135, 88 S.Ct. 1620. Deland's statements were not the type of improperly redacted statements that were the subject of *Gray*. The district court merely asked for the statements to be redacted beyond what the Supreme Court and several circuit courts have held necessary to avoid a violation under *Bruton*. As the district court noted, the statements as first read by Deland were sufficiently redacted under *Bruton* and *Gray*, though they were not read as further redacted by the district court. The "other individual" that Deland referred to in his testimony was never mentioned again during his testimony. Clemmons's statements did not compel an inference by the jury that Winston was "the other individual." The jury learned only that Clemmons entered the house and another person accompanied him. The jury did not learn whether Winston was Clemmons's companion or whether Winston was involved in the murder of Figures. Therefore, the district court did not abuse its discretion in denying Winston's motion for mistrial based on Deland's statements.

■ Furthermore, even if there was a violation under *Bruton* it would have been harmless in light of the overwhelming evidence of Winston's guilt. *See United States v. Cope*, 312 F.3d 757, 2002 WL 31548782 (6th Cir. Nov.19, 2002); *Stanford v. Parker* 266 F.3d 442, 456–57 (6th Cir.2001) (holding that because there was overwhelming evidence of Stanford's guilt, any *Bruton* violation constituted harmless error). During the fourteen-day trial, the jury heard a staggering number of witnesses testify to Winston's actions and statements at each stage of the events of February 20, 1997. Not only did these witnesses assist in establishing a timeline of events, they were able to present corroborating evidence to detail Winston's involvement in the murder. Among the witnesses who testified to Winston's involvement in the murder of Figures, were Hartfield, an eyewitness to the murder at the Hartfield residence, and Nelson. Winston's girlfriend and an accomplice in the disposal of Figures's body. Therefore, the district court did not abuse its discretion in denying Winston's motion for a mistrial based on a *Bruton* violation.

## B. *Brady* Violation

Clemmons argues that the district court erred in denying his motion for new trial based on a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by the Government. We review the denial of a motion for a new trial for abuse of discretion. *United States v. Frost*, 125 F.3d 346, 382 (6th Cir.1997). The Supreme Court has held that in the context of an alleged *Brady* violation, a new trial may only be granted if the defendant shows that "the undisclosed evidence undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

### 1. Applicable Law

Under *Brady*, the Government has the duty to disclose all exculpatory evidence "material to either guilt or punishment." 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court later extended the Government's duty under *Brady* to include disclosure of material evidence that could be used to impeach the credibility of a witness. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The Supreme Court clarified the meaning of "materiality" in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and held that any favorable evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375; *Schledwitz v. United States*, 169 F.3d 1003, 1011 –1012 (6th Cir.1999). Therefore, a defendant is not required under *Brady* or *Bagley* to show that the undisclosed evidence would produce an acquittal. Moreover, in determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the "reasonable probability" test is met. *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555.

### 2. Applying the *Brady* rule

Clemmons argues that the nondisclosure of evidence regarding the credibility of a Government witness. Amere May, falls within the scope of *Bagley* and warrants a new trial. May, a cellmate of Clemmons, testified that Clemmons told him all of the details of the events of February 20, 1997.

In particular, he testified that Clemmons told him that he was directly involved in the murder of Figures, and that he kept Figures's head in the trunk of the car as a trophy. He also testified that Clemmons told him that he owed Figures a $10,000 drug debt. Several weeks after trial, it was discovered that the Government had failed to disclose evidence that May had fabricated letters of good character to then Chief United States District Judge Richard Enslen, who was to sentence May for his bank fraud conviction. After a hearing, the district court denied Clemmons's motion for a new trial based on the newly discovered evidence.

The district court focused its analysis mostly on the standard we articulated in *Schledwitz* in denying Clemmons's motion. Under *Schledwitz*, we held that a defendant needed to show that (1) the new evidence was discovered after trial, (2) the evidence could not have been discovered earlier with due diligence; and (3) the evidence presented a reasonable probability that the outcome of the proceedings would have been different, 169 F.3d at 1011–12. The Government admitted that the evidence was available to them, but due to a lack of communication between the United States Attorney's Office and the Federal Bureau of Investigation it was only made known to them after the trial. Thus the first and second prongs of *Schledwitz* were satisfied. *See Kyles* (holding that knowledge of evidence from one United States Department of Justice employee is imputed to all employees of the Department of Justice. However, the district court found that the third prong of *Schledwitz* was not satisfied. Though the district court admonished the Government for "bring(ing) a fail house snitch to testify," the district court characterized May as a minor witness. Specifically, the district court noted that there were several other witnesses who testified to Clemmons's

drug trafficking and his involvement in the Figures murder. Additionally, the district court noted that DNA analysis established that Figures's blood was on Clemmons's jacket, and there was a substantial amount of other evidence implicating Clemmons in the murder. The district court also found that Clemmons had the opportunity to cross-examine May extensively. Examining all of this evidence collectively, the district court determined that May's testimony was not essential in proving Clemmons's involvement in the murder.

■ There is no evidence to support a finding by this Court that the district court abused its discretion in denying Clemmons's motion for a new trial. The undisclosed impeachment evidence certainly would present a question of materiality under *Bagley*, and in isolation, May's testimony may have proven exceptionally damaging against Clemmons. However, when considered in conjunction with the testimony of other witnesses and the other evidence presented at trial, May's testimony was incidental at best. *Cf. Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (holding that undisclosed evidence was material because it related to the credibility of the co-conspirator, who was the key Government witness). Most importantly. May testified that his knowledge of the murder was based solely on what Clemmons had relayed to him in the confines of their prison cell. As the district court noted, no less than six witnesses testified to Clemmons's involvement in the murder of Figures based on their direct interactions with him on the day of the murder. Furthermore, May's description of the events involving the murder, especially his testimony that Clemmons had travelled to Benton Harbor to dispose of the body, was significantly contrary to the testimony of other witnesses. On cross-examination, May's prior

convictions and offer of a reduced sentence in exchange for his testimony were presented to the jury. Given these facts, it is unlikely that the newly discovered evidence would have had a significant impact on the jury's assessment of May's credibility and veracity. A further attack of May's credibility using the undisclosed evidence would not have raised a reasonable probability that the results of the proceeding would have been different under *Kyles*. Therefore, the district court did not abuse its discretion in denying Clemmons's motion for a new trial based on the undisclosed impeachment evidence.

### C. Other Claims Asserted both Individually and Jointly

Clemmons and Winston also assert several other assignments of error in the trial proceedings. We find no merit in these other claims and discuss them only briefly.

#### 1. Admission of Clemmons's Statements

Clemmons argues that the district court erred in allowing portions of a letter he wrote to be read into evidence. Federal Rule of Evidence ("FRE") 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403(2002). Under FRE 403, it is within the sound discretion of the trial judge to determine whether to admit allegedly unduly prejudicial evidence. *See In re Beverly Hills Fire Litigation*, 695 F.2d 207, 217–18 (6th Cir.1982). Therefore, we review an evidentiary ruling by the district court for abuse of discretion. *United States v. Langan*, 263 F.3d 613, 620 (6th Cir.2001) ("We will not disturb a district court's evidentiary rulings unless we find an abuse of discretion.").

■ At trial, the Government argued that portions of a letter Clemmons wrote to a friend while in custody were an admission by Clemmons of his knowledge about Figures's murder. At trial, the Government was permitted to read redacted portions of the letter into evidence as an admission by a party-opponent under FRE 801(d)(2)(A)(2002). The district court ruled that the redacted portions of the letter could be read into evidence because they were "an admission by the defendant ... that he has knowledge that these people have knowledge that the crime occurred." In summarily evaluating the portions of the letter under FRE 403 for unfair prejudice, the district court ruled that he did not "see any unfair prejudice."

Because Clemmons's statements acknowledge that he is concerned about two other people with knowledge of the murder, they certainly can be interpreted as indicating his consciousness of guilt. *See, e.g., United States v. Gartmon*, 146 F.3d 1015, 1022 (D.C.Cir.1998) (holding that admission of tape recordings on which defendant admits to retaining a lawyer are probative of defendant's consciousness of guilt); *United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir.1986) ("spoliation evidence, including evidence that defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt.") (citations omitted). Clemmons makes no argument explaining how this evidence, properly admitted under FRE 801(d)(2)(A), is unfairly prejudicial under FRE 403. The evidence admitted simply shows Clemmons's state of mind and knowledge and infers nothing about his character or propensity to commit the crimes charged. *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir.1993) ("Unfair prejudice ... does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence.") (citation omitted). Therefore, the

district court did not abuse its discretion under FRE 403 in allowing the jury to hear portions of Clemmons's letters.

## 2. *Pinkerton* Jury Instruction

Clemmons argues that the district court erred in giving the jury instructions under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), for Clemmons's liability for the homicide of Figures. We review challenges to jury instructions "as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." *Innes v. Howell Corp.*, 76 F.3d 702, 714 (6th Cir.1996). The district court "may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72 (6th Cir.1990).

### a. Applicable Supreme Court Precedent

In *Pinkerton,* the Supreme Court articulated the rule that conspirators are criminally liable for substantive crimes committed by their co-conspirators in furtherance of the conspiracy, 328 U.S. at 647–48, 66 S.Ct. 1180. The Court said that a co-conspirator may avoid liability if the substantive crime does not fall "within the scope of the unlawful project, or . . . could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.; see also Frost,* 914 F.2d at 762.

The question of whether an instruction should have been given under *Pinkerton* depends on "whether the evidence was sufficient for a reasonable jury to have concluded beyond a reasonable doubt that the murder was a reasonably foreseeable consequence of the drug conspiracy alleged in the indictment." *United States v. Mothersill,* 87 F.3d 1214, 1217 (11th Cir.

1996) (citations omitted). In reviewing a district court's decision to submit a jury instruction under *Pinkerton,* we must "view the evidence in the light most favorable to the government and accept all the jury's reasonable inferences and credibility choices which support the verdict." *Mothersill,* 87 F.3d at 1217 (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

### b. Applying *Pinkerton*

Clemmons argues that the evidence at trial was insufficient to establish either that the murder of Figures by Winston was committed in furtherance of the conspiracy or that the murder could have been reasonably foreseen as a necessary and natural consequence of the conspiracy. Instead. Clemmons argues that the murder was completely unexpected and spontaneous.

The district court ruled that under a very narrow *Pinkerton* instruction the jury would be told that Clemmons could be liable for the murder of Figures if he "understood at the time that Figures was put in the trunk or because of those events that occurred that day that [Figures] was going to be murdered or it was reasonably foreseeable that Figures was going to be murdered." If we view the evidence in the light most favorable to the Government, as we must, there was sufficient evidence for the jury to determine that the murder of Figures was done in furtherance of the drug conspiracy and was reasonably foreseeable as a necessary and natural consequence of the conspiracy. *United States v. Henning,* 286 F.3d 914, 920 (6th Cir. 2002) (holding that it was not error for the district court to give a *Pinkerton* instruction once it determined that sufficient evidence had been presented to send the question of whether a conspiracy existed to the jury). Specifically, the evidence at

trial showed that (1) from his prior associations with Winston. Clemmons reasonably would have known that Winston was capable of violence: (2) Winston and Clemmons went to Hartfield's house with the intention of confronting Figures regarding prior drug transactions; and (3) after Figures had been shot by Winston and threatened by Clemmons inside Hartfield's house, Winston demanded that Figures be put in the trunk of Hartfield's car. Even if it was not reasonably foreseeable to Clemmons that Figures would be murdered during the initial confrontation inside the house, it was certainly reasonably foreseeable when Winston demanded that Figures be put in the trunk that he would be murdered. If we accept all the jury's reasonable inferences and credibility choices, it would support their verdict that Clemmons was liable for the murder of Figures under *Pinkerton* . Therefore, the district court did not err in giving the jury a limited *Pinkerton* instruction based on the evidence presented.

### 3. Ineffective Assistance of Counsel

In his final individual claim. Clemmons argues that his trial counsel rendered ineffective assistance. We do not address on direct appeal claims of ineffective assistance of counsel unless the record has been sufficiently developed to provide meaningful factual review. *Brown,* 276 F.3d at 217. In this case, we have no evidence to evaluate counsel's performance at trial. Accordingly, we will defer review of these claims to a post-conviction proceeding, if any, in order to fully develop the record. *Id.; see also United States v. Aguwa,* 123 F.3d 418, 423 (6th Cir.1997) ("Our court has routinely concluded that such claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255.").

### 4. Jury Instruction on Malice Aforethought

Both Winston and Clemmons were charged in Count Three of the indictment with a violation of 18 U.S.C. § 924(j). Winston was charged as a principal and Clemmons was charged as an aider and abettor Jointly, they argue that the district court erred in its instruction to the jury on the definition of "malice aforethought." We review challenges to jury instructions "as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." *Innes.* 76 F.3d at 714. The district court "may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard,* 900 F.2d at 72.

At trial, Winston and Clemmons argued that the district court's definition incorporated second-degree murder into one of the elements needed to prove a violation of § 924(j), using a firearm to commit a drug-related murder. In its instructions to the jury on this count, the district court's third definition of malice aforethought was "to act recklessly with extreme disregard for human life."

There are four elements that the Government must prove in order to sustain a violation of § 924(j): 1) the commission of a federal crime of violence or drug trafficking; 2) the use or carrying of a firearm during or in furtherance of such a crime; 3) the death of person by the use of the firearm; and 4) the death was caused by murder as defined in 18 U.S.C. § 1111 (2002). As the Government argues, satisfying § 924(j) requires proof only that the killing was a murder as defined in § 1111. Section 1111(a) explicitly defines both first-degree murder and second-degree murder, and therefore the reference in § 924(j) to "murder (as defined in section 1111)" incorporates by reference both first

and second-degree murder. This Court has held that malice aforethought in the context of second-degree murder is defined as "[w]hen a defendant grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury." *See United States v. Milton,* 27 F.3d 203, 208 (6th Cir.1994). The district court instructed the jury precisely in the manner that we defined in *Milton.* Because the district court instructed the jury that malice aforethought could be found if Winston "grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death," there is no error in the instruction. *United States v. Sheffey,* 57 F.3d 1419, 1430 (6th Cir.1995) (holding that jury instructions articulating the standard set out in *Milton* are an accurate statement of the law).

### 5. Denial of Joint Motion to Set Aside the Verdict and Dismiss Count Three

Finally, Winston and Clemmons argue jointly that the district court erred in denying their Joint Motion to Set Aside the Verdict and Dismiss Count Three. We review the denial of a motion to set aside a verdict for abuse of discretion. *Clay v. Ford Motor Co.,* 215 F.3d 663, 672 (6th Cir.2000). In determining whether to grant a new trial when the claim is that the verdict is against the weight of the evidence, a district court must compare and weigh the opposing evidence and it must set aside the verdict if it determines that the verdict is against the clear weight of the evidence. *Id.*

Count Three of the Fourth Superseding Indictment charged Winston and Clemmons with the use of a firearm to commit a drug-related murder in violation of § 924(c), (j). Winston and Clemmons ar-

gue that given the Supreme Court's recent decision in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). § 924(c) (incorporated by reference in § 924(j)) violates the Commerce Clause of the Constitution. They argue that, although Congress may regulate activity that "substantially affects interstate commerce" under its commerce clause power, § 924(j) regulates a purely intrastate activity in this case. *Morrison,* 120 S.Ct. at 1749 (quoting *United States v. Lopez,* 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (citations omitted)). They also argue that no evidence was presented at trial that either the drug trafficking, the firearms purchase, or the murder occurred outside the borders of Michigan and thus there was no substantial effect on interstate commerce.

In denying Defendants' Joint motion, the district court relied principally on our decision in *United States v. Tucker,* 90 F.3d 1135 (6th Cir.1996). We reasoned in *Tucker* that "drug-trafficking is an 'economic enterprise' that substantially affects interstate commerce in numerous clear ways." 90 F.3d at 1140. In the present case, the district court agreed with the Government that *Tucker* provides the basis for upholding the validity of § 924(c) under the Commerce Clause because the basis of Congressional power in enacting that statute is the regulation of drug trafficking, which is interstate in nature. In relying on *Tucker* the district court found that no court has addressed directly the validity of § 924(c) post-*Morrison. Id.* However, the district court found that several courts upheld challenges to § 924(c) under *Lopez,* and in support, the district court cited *United States v. Walker,* 142 F.3d 103, 111 (2d Cir.1998) ("we find Section 924(c)(1) regulates an economic activity that substantially affects interstate commerce"); *United States v. Bell,* 90 F.3d 318, 320 (8th Cir.1996) ("Section 924(c)(1),

unlike Section 922(q), is tied to interstate commerce"); *United States v. Staples*, 85 F.3d 461, 463 (9th Cir.1996) (adopting the Eighth Circuit view that § 924(c)(1) is based on an underlying 841(a)(1) drug trafficking offense, which involves an activity that substantially affects interstate commerce).

The district court went on to reason that *Morrison* did not change the analysis of § 924(c) under *Lopez* because the statute requires a connection to drug trafficking, which can be regulated by Congress under the Commerce Clause as an interstate, economic activity. The district court also did not find our decision in *United States v. Corp*, 236 F.3d 325 (6th Cir.2001) to be applicable. The district court found that *Corp* was limited to the facts of the case and noted that in *Corp* we did not hold any statute unconstitutional, rather we held that the particular activities in which Corp was participating were not activities that Congress intended to regulate.

The analysis undertaken by the district court was thorough and consistent with the state of the law in this Court and other circuits. Section 924(c) is based on the underlying offense of drug trafficking. In our most recent discussion of Congress's power to regulate drug trafficking under the Commerce Clause, we held that Congress is permitted to regulate drug trafficking and related crimes that occur solely intrastate under the Commerce Clause. *United States v. Brown*, 276 F.3d 211, 214–15 (6th Cir.2002) (citations omitted). Therefore, the district court did not abuse its discretion in denying Appellants' Joint Motion to Set Aside the Verdict and Dismiss Court Three.

* The Honorable Sandra S. Beckwith, United States District Judge for the Southern District

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions and sentences of Winston and Clemmons.